GRASSO SERVICE CENTER,
INC., et al.

v.

Alan SEPE, in his capacity as Acting
Director of the City of Providence De-
partment of Public Property et al.

No. 2007–76–Appeal.

Supreme Court of Rhode Island.

Jan. 15, 2009.

Michael F. Horan, Pawtucket, for Plaintiff.

Anthony F. Cottone, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on November 3, 2008, on appeal by the plaintiffs, eight automobile-tow operators authorized to do business in the State of Rhode Island and the Rhode Island Public Towing Association, Inc., a Rhode Island corporation that represents the majority of tow operators in Rhode Island (collectively plaintiffs). The plaintiffs appeal from a Superior Court judgment denying their request for declaratory and injunctive relief and dismissing their complaint against the defendants, Alan Sepe (Sepe), in his capacity as acting director of the City of Providence Department of Public Property, the City of Providence Board of Contract and Supply (Board of Contract and Supply), Colonel Dean M. Esserman, in his capacity as chief of police of the City of Providence, and David N. Cicilline, in his capacity as mayor of the City of Providence (collectively defendants). A proposed modification to the police-instigated towing program in the City of Providence (city or Providence) constitutes the genesis of this dispute. For the reasons set forth in this opinion, we vacate the judgment of the Superior Court.

### Facts and Travel

Based on its Home Rule Charter, Providence enacted an ordinance that vested the Providence Police Department with the authority to create a list of tow operators for police-instigated towing and storage of vehicles and to adopt pertinent regulations for the program. See Providence Code of Ordinances §§ 15–23[1] and 15–25.[2] In 2003, the Providence Police Department

1. Section 15–23 of the Providence Code of Ordinances, entitled "Use of towing service companies by police department," provides:
 "(a) *Agreement required.* The police department shall call only upon towing service companies which have indicated by a writing deposited with the commissioner of public safety their agreement to abide by the provisions of this article and the rules and regulations promulgated hereunder,

proposed reforms of its procedures for towing, storing, and disposing of illegally parked vehicles in the city, and, through the Board of Contract and Supply, it issued a Request for Proposals (2003 RFP). The 2003 RFP proposed dividing the city into four zones and assigning two tow operators to each zone. The tow operators would be selected after competitive bidding and for a period of three years, with the possibility of two one-year extensions; the selected tow operators would be the only two tow operators the city used in that zone. To be considered for the program, a tow operator was required to submit a bid proposal that included "a referral fee of no less than 20 [percent] per tow and 10 [percent] per storage," although higher bids were anticipated.

The plaintiffs filed a complaint in the Superior Court challenging the 2003 RFP and seeking declaratory and injunctive relief. On July 7, 2005, the trial justice granted defendants' motion for summary judgment, and plaintiffs appealed. However, Providence issued an amended RFP in June 2006 (2006 RFP), thus rendering the appeal moot. This Court dismissed that earlier appeal, but did so "without prejudice to * * * plaintiff[s] raising a new challenge to the modified RFP and contracts." *Rhode Island Public Towing Association, Inc. v. Cicilline,* No. 2005–273–A. (R.I., filed Nov. 17, 2006) (mem.).

The 2006 RFP was virtually identical to the 2003 RFP in that it proposed to divide the city into four zones with two tow operators designated as exclusive providers in each zone. The 2006 RFP required that each bidder be certified by the Public Utilities Commission (PUC) and submit a bid promising to remit a referral fee to the city of no less than 20 percent of each tow and 10 percent of the storage charges. As in the 2003 RFP, higher bids were anticipated. In response to the 2006 RFP, seventeen bids were submitted, and Sepe then recommended two tow operators for each of the four zones. The Board of Contract and Supply voted to accept Sepe's recommendations.

On January 22, 2007, plaintiffs filed a complaint in the Superior Court seeking declaratory and injunctive relief. The plaintiffs alleged (1) that the 2006 RFP unlawfully infringed on the regulatory authority of the PUC, (2) that the referral fee constituted an illegal tax, (3) that the 2006 RFP was an "unlawful confiscatory taking and an unlawful denial and abridgment of the constitutional and statutory rights of [p]laintiffs and other unsuccessful bidders similarly situated," and (4) that the process by which the city sought to implement the 2006 RFP was "arbitrary and capricious and a clear abuse of their discretion." The plaintiffs also asked the Superior Court to enjoin the city from imple-

and have further agreed to remove vehicles as provided herein, for storage if other than the premises of or under direct control of said towing service companies only to suitable places in the city whose owners or operators have also indicated by a writing deposited, as aforesaid, their willingness to abide by the provisions hereof and the rules and regulations promulgated hereunder. Towing service companies will be required to release towed vehicles only during normal daylight hours of 8:00 a.m. to 6:00 p.m. for seven (7) days a week.

"(b) *Listing to be followed.* Towing service companies registered as aforesaid, with the commissioner of public safety shall be listed in alphabetical order and shall be called upon for their services by said police department to the greatest possible extent in the order of their appearance on said list."

2. Section 15–25 of the Providence Code of Ordinances, entitled "Rules and regulations to implement article," provides:

"The commissioner of public safety may make further rules and regulations not inconsistent herewith to implement the provisions of this article."

menting the 2006 RFP and to stay any implementation until the Superior Court made its ruling. The trial justice denied this request.

The parties agreed, pursuant to Rule 65(a)(2) of the Superior Court Rules of Civil Procedure, to consolidate the hearing on the prayer for a preliminary injunction with a trial on the merits. As their only witness, plaintiffs called Sepe, who was involved in formulating both the 2003 RFP and the 2006 RFP. He testified that the zones were established based on the yearly average number of tows in those areas and, according to the witness, the referral fees were imposed to offset the costs of administering the program. Significantly, Sepe offered no figures reflecting the actual administrative expenses and gave a generalized explanation that the program utilized the services of dispatchers, police officers, and clerks. Mr. Sepe also testified that to his knowledge contracts were awarded to those companies deemed qualified by the city that were the highest bidders in their respective zone.

On March 1, 2007, the trial justice issued a written decision denying all relief. He found that the PUC never has sought to regulate municipal tow lists and that the city's administration of the towing program did not infringe on the PUC's authority. The trial justice determined that the referral fee would not increase the rate charged to customers; he concluded that, under a plain reading of the statute, it was clear that "the [General Assembly's] mandate concerning the rates charged and prohibition of rebates or remissions is in reference to the transaction *between the tow company and the customer.*" (Emphasis added.) The trial justice declared that because a tow operator did not have a constitutionally protected right to be included on a tow list, the 2006 RFP did not create a franchise. Additionally, the trial justice concluded that plaintiffs had failed to prove that the referral fee was an illegal tax because plaintiffs made no showing that the fees were revenue measures and were not designed to offset the costs of administering the towing program. Finally, the trial justice rejected plaintiffs' argument concerning irregularities in the bid process. On March 19, 2007, plaintiffs timely appealed, and this Court issued a stay of the judgment while the appeal was pending.

Before this Court, plaintiffs challenge the trial justice's finding that the 2006 RFP and the resulting contracts do not unlawfully infringe on the PUC's power to regulate tow operators. The plaintiffs also argue that the trial justice erred when he found that awarding exclusive contracts to the successful bidders would not constitute an illegal franchise. Additionally, plaintiffs contend that the trial justice erred when he ruled that the referral fees were allowable because the General Assembly's prohibitions against refunds and remittances applied to the vehicle owner and not the city. Finally, plaintiffs contend that the referral fees constitute an illegal tax.

The defendants respond that the General Assembly, through the Towing Storage Act, G.L.1956 chapter 12.1 of title 39(act), has delegated the authority to administer towing programs to municipalities and that the 2006 RFP is not preempted by or otherwise in conflict with state law. The defendants also argue that G.L.1956 § 39–12–12 only prohibits a carrier from refunding or remitting any portion of the rates to the customer; they contend that the statute does not prevent payment of a referral fee to a municipality. Finally, defendants contend that creating an exclusive towing list does not create a franchise and that plaintiffs failed to prove that the referral fees constituted a tax.

### Standard of Review

■■■ "A Superior Court decision granting or denying declaratory relief is

reviewed with great deference by this Court." *Providence Lodge No. 3, Fraternal Order of Police v. Providence External Review Authority*, 951 A.2d 497, 502 (R.I. 2008) (citing *Fleet National Bank v. 175 Post Road, LLC*, 851 A.2d 267, 273 (R.I. 2004)). Similarly, "[w]hen called upon to review the determination of a trial justice to grant or deny a permanent injunction, this Court will overturn the justice's findings of fact only when those findings are 'clearly wrong' or when the justice has 'overlooked or misconceived material evidence.'" *Providence Teachers' Union Local 958, AFL–CIO, AFT v. City Council of Providence*, 888 A.2d 948, 952 (R.I.2005) (quoting *Retirement Board of the Employees' Retirement System of Providence v. City Council of Providence*, 660 A.2d 721, 724 (R.I.1995)). However, questions of law and statutory interpretation are reviewed *de novo* by this Court. *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001).

## Analysis

■ We begin by noting that this appeal is properly before the Court. In the Superior Court, defendants argued that the action should be dismissed based on the law of the case doctrine.[3] In light of the travel of this dispute, we must ask: what law in what case? Although in a similar action filed in 2003 judgment was

entered against plaintiffs, the issues on appeal never were decided by this Court because subsequent events rendered the controversy moot. *See Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence*, 754 A.2d 89, 90 (R.I. 2000) ("This Court has consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy."). Additionally, when we dismissed the first action, we did so "without prejudice to * * * plaintiff[s] raising a new challenge to the modified RFP and contracts." *Cicilline*, at No. 2005–273–A. (mem.). The plaintiffs mounted such a challenge and now properly appeal from the trial justice's decision in this case.

## Delegation

The bifurcation of authority between the PUC, a statewide regulatory body, and the city to regulate police-instigated tows within the city is a point of contention in this case.[4] Under § 39–12–4(a)(1), the PUC is vested with exclusive authority to "regulate common carriers by motor vehicle," a classification that includes, but is not limited to, tow operators. Additionally, in performing this function, the PUC is governed by standards confining that power.[5] This Court has acknowledged that the General Assembly may elect to delegate legislative power to a municipality as long as "it is limited by standards sufficient to confine

---

3. "The law of the case doctrine provides that, after a judge has decided an 'interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical matter, should refrain from disturbing the first ruling.'" *Balletta v. McHale*, 823 A.2d 292, 295 (R.I. 2003) (quoting *Leone v. Town of New Shoreham*, 534 A.2d 871, 873 (R.I.1987)).

4. We note that the PUC is not a party to the present action, nor has it sought to intervene.

5. General Laws 1956 § 39–12–1 provides in pertinent part:
 "It is hereby declared to be the policy of the state to regulate transportation of property by motor carriers upon its publicly used highways in such manner as to recognize and preserve the inherent advantages of transportation, and to foster sound economic conditions in transportation and among carriers engaged therein in the public interest; and in connection therewith to:
 "(1) Promote adequate, economical, and efficient service by motor carriers and rea-

the exercise of that power for the purpose for which the delegation was made." *Metals Recycling Co. v. Maccarone*, 527 A.2d 1127, 1129 (R.I.1987); *see also Thompson v. Town of East Greenwich*, 512 A.2d 837, 842 (R.I.1986) (deeming it a sufficient statutory restriction on the power of a local liquor-licensing board to require that the conditions it established to obtain a liquor license be reasonable). Before a tow operator may transport property on a public highway, the PUC must, in accordance with the standards established by the General Assembly, issue a certificate of public convenience, § 39–12–6, and the tow operator must file its rates with the PUC, § 39–12–12.

In chapter 12.1 of title 39, the General Assembly recognized that police departments have the legal duty to remove certain vehicles from the public roadways and that a municipality may select tow operators for those services. Although the city argues that this statute contains "a specific legislative delegation of authority," our careful review of the statutory scheme compels a different conclusion in this case. Section 39–12.1–3(a) provides that "[a]ny member of any police department * * * may order the removal of any abandoned or unattended vehicle * * *." This is the sole delegation of authority to a municipality in the act.

Additionally, the responsibility for supervising, regulating, and enforcing the provisions of the act rest with the Division of Public Utilities and there has been no transfer or delegation of that authority to the cities and towns. We note that the act contains a long and detailed declaration of legislative purpose and policy in its preamble;[6] however, such declarations are aspirational and based upon findings made by the General Assembly. Although

---

sonable charges therefor without unjust discriminations, undue preferences, or advantages or unfair or destructive competitive practices;

"(2) Improve the relations between, and coordinate transportation by and the regulations of motor carriers and other carriers;
" * * *

"(4) Promote safety upon its publicly used highways in the interest of its citizens."

**6.** General Laws 1956 § 39–12.1–1 recognizes that the involuntary removal of automobiles from public and private property affects the rights of the vehicle owner, the property owner, and the overarching concern for public safety. Section 39–12.1–1 provides in pertinent part:

"The legislature hereby finds the following legislation to be in the public interest for these reasons:

"WHEREAS, A tow truck in the hands of an incompetent operator is a dangerous instrumentality; and

"WHEREAS, The public has an inherent right to ready access to the name, location, and telephone number of certificated towers; and
" * * *

"WHEREAS, The motoring public has a right, when delegating to law enforcement the selection of an operator in the towing-storage business, to expect that the operator selected and responding will be competent; and

"WHEREAS, The motoring public has a right when delegating to law enforcement the selection of an operator in the towing-storage business, to expect that the charges for the services to be rendered will be reasonable and compensatory, and that the operator is physically equipped in his or her business to function properly; and

"WHEREAS, The towing and storage of a vehicle without the owner's consent, as is the case in most police instigated tows, requires certain procedures to assure the owner that rights of due process of law are not violated; and

"WHEREAS, The owner or person in control of private property of real estate has a right to be free from trespass by vehicle on the private property; and to have any such trespassing vehicle removed at the owner's expense; and

"WHEREAS, The police powers delegated by the legislature of the state include the power of the police, even without the own-

"[p]reambles may be used to clarify ambiguities, * * * they do not create rights that are not found within the statute." 73 Am.Jur.2d *Statutes* § 110 at 320 (2001).

The substantive provisions of the act describe the circumstances under which a police officer lawfully may order the removal of a vehicle by a certificated tower, § 39–12.1–3(a), and identify the person who is liable "for all reasonable costs of recovery, towing, and storage in accordance with the certificated towers' tariff." Section 39–12.1–3(b). Further, the act specifically grants the person possessing the vehicle "the right to have any certificated tower of his or her choice attend to the removal[.]" Section 39–12.1–3(d). The act also includes uniform procedures under which a certificated tower possessing a vehicle must provide notice to the local police department, as well as to the last registered owner of the vehicle and all lienholders of record. Section 39–12.1–4. Any certificated tower lawfully possessing a vehicle in accordance with the act is granted a possessory lien on the vehicle and its registration plates in an amount consistent with its published tariff. Section 39–12.1–6. The statute also provides for a waiting period with notice requirements for enforcement and foreclosure of the tower's lien. Sections 39–12.1–7 and 39–12.1–8.

■ Thus, with the exception of authorizing "[a]ny member of any police department" to order the removal of a vehicle, § 39–12.1–3(a), the provisions of the act are silent with respect to the cities and towns. Indeed, enforcement of the provisions of the statute is the responsibility of the public utilities administrator, who "shall supervise, regulate, and enforce [its] provisions." Section 39–12.1–15. Consequently, we are of the opinion that the act does not contain a specific delegation of legislative authority to the city to enter into contracts with certificated towers based on competitive bids for a percentage of the tower's tariff. The city may exercise its discretion in administering its police-instigated towing program and may divide the city into zones and select the tow operator or operators it wishes to use within those zones, but it may not do so on the basis of the 2006 RFP in this case. Additionally, the General Assembly has determined that the tower may not refund or remit a portion of its rate.

**Preemption**

■ After careful review of the record in this case, we are satisfied that the city's discretion to administer its police-instigated towing program is not unfettered. Not only is the PUC vested with exclusive authority to license and regulate tow operators, but also § 39–12–12 contains language that prohibits a tow operator from refunding or remitting "in any manner" any portion of its fee. Section 39–12–12. To determine whether this state law preempts a local ordinance, we must consider whether the General Assembly "intended that its statutory scheme completely occupy the field of regulation on a particular subject." *Providence*

er's consent, to have public ways cleared of conditions which, in the opinion of the officer, creates a hazardous condition to the motoring public; to have removed abandoned, abandoned and of no value, and unattended vehicles; to have removed and/or relocated vehicles in violation of parking ordinances; and to have removed any vehicle under control of any person arrested for any criminal offense; and

"WHEREAS, The process of selection of the operator of a towing-storage business for police work is unique in that law enforcement, though having the legal duty to order the work, has no legal duty to pay costs and charges connected therewith, the same being the duty of the vehicle owner."

*Lodge No. 3, Fraternal Order of Police,* 951 A.2d at 504 (quoting *Town of Warren v. Thornton–Whitehouse,* 740 A.2d 1255, 1261 (R.I.1999)). This determination is more complicated when, as has occurred in the present case, "there has been limited delegation of regulatory authority to the cities and towns." *Id.* Nevertheless, despite a limited delegation of authority, "[o]rdinances * * * will be found unenforceable and invalid when they are in contravention of the city charter or the general laws of the state." *Providence City Council v. Cianci,* 650 A.2d 499, 501 (R.I.1994) (citing *Wood v. Peckham,* 80 R.I. 479, 98 A.2d 669 (1953), and *State v. Berberian,* 80 R.I. 444, 98 A.2d 270 (1953)).

 Section 39–12–12 provides that "no carrier shall *refund or remit in any manner* or by any device, *directly or indirectly,* or through any other person, any portion of the rates or charges so specified[.]" (Emphases added.) When interpreting a statute, this Court's task is to give effect to the expressed intent of the General Assembly. *Champlin's Realty Associates, L.P. v. Tillson,* 823 A.2d 1162, 1165 (R.I.2003) (citing *Thornton–Whitehouse,* 740 A.2d at 1259). "[W]e presume that the [General Assembly] intended to attach a significant meaning to every word, sentence, or provision of a statute." *Id.*

 By its plain and unambiguous language, § 39–12–12 prohibits all common carriers, including tow operators, from refunding or remitting any portion of their tariff to any person, directly or indirectly. The terms refund and remit are distinct

words that have independent meaning and significance. "Refund" means "to give back or restore (esp.money); repay." Random House Unabridged Dictionary 1622 (2d ed.1993). A tow operator is prohibited from giving back or restoring the fee to the person who paid the towing or storage charges—usually the vehicle owner. *See* § 39–12.1–1. In contrast, "remit" is defined as "to transmit or send (money, a check, etc.) to a person or place, usually in payment." Random House Unabridged Dictionary 1630 (2d ed.1993). Thus, the term "remit" does not imply giving back or restoring the fee, but rather relates to a transfer of a portion of the tariff to a person in payment, not repayment. We are satisfied that this definition includes a prohibition against payment to the police department that instigates the tow.[7] Accordingly, state law explicitly prohibits tow operators from both refunding money to a customer and from transmitting "any portion of the rates or charges" to anyone "in any manner," including the person or entity that selects the tow company. Section 39–12–12.

In his decision the trial justice declared that "[i]t is clear from the plain language in the statute that the [General Assembly's] mandate concerning the rates charged and prohibition of rebates or remissions is in reference to the transaction between the tow company and the customer." We respectfully disagree and discern no language in the statute that supports this holding.[8] The statute prohibits a tow operator from remitting a portion of the rates, regardless of the recipient. Section

---

7. The term also embraces the pejorative practice of paying a "kickback" to the person who selects the tow operator or, as the city suggests, demanding political contributions from tow operators in exchange for towing work in the city.

8. We deem the trial justice's interpretation particularly unconvincing in the context of

police-instigated tows when the vehicle owner is a stranger to the transaction. Because there is no relationship between the tow operator and the vehicle owner before the tow, we are hard-pressed to envision a situation in which the tow company would refund a portion of its fee to a member of the public who is attempting to gain possession of his or her vehicle.

39–12–12. There is no language that indicates the General Assembly intended to exempt municipalities from the statutory prohibition against splitting a portion of the rate.[9] Accordingly, we are of the opinion that a tow operator may not pay or agree to pay a remittance to a municipality, and we equally are satisfied that Providence may not require such a payment in exchange for a position on a tow list.

Moreover, we conclude that participation in the 2006 RFP, in violation of § 39–12–12, would expose the carrier to the sanctions set forth in § 39–12–37:

"Any person, whether carrier, shipper, consignee, or any officer, employee, agent, or representative thereof who:

"(1) Shall knowingly offer, grant, or give or solicit, accept, or receive any rebate, concession, or discrimination in violation of any provisions of this chapter; or * * * shall be guilty of a misdemeanor, and upon conviction thereof, be fined not more than three hundred dollars ($300) or by imprisonment for a term not exceeding one year or both." Section 39–12–37.

The defendants argue that § 39–12–37 does not apply because a municipality is not listed as an entity that must comply with the statute. However, our concern is not that the city would violate the statute, but rather that compliance with the terms of the 2006 RFP would require tow operators, including plaintiffs in this case, to disregard the statute.

Accordingly, although Providence may develop a uniform procedure for selecting certificated towers for police-instigated tows, it may not enter into exclusive contracts that require a tow operator to remit a portion of the rates or charges to the city in exchange for the contract. Thus, because Providence may not implement the 2006 RFP as written, we need not address the plaintiffs' remaining contentions.

### Conclusion

For the above reasons, we vacate the judgment in this case and remand the record to the Superior Court with directions to enter a new judgment consistent with this opinion.

---

9. Both the trial justice and defendants focus on the intent of the General Assembly to protect vehicle owners and consumers through regulation of tow operators, but this analysis ignores the broader impact of chapters 12 and 12.1 of title 39. Although § 39–12.1–1 clearly reflects the intent of the General Assembly to protect the motoring public in the context of police-instigated tows, the reach of chapter 12 of title 39 is more expansive. Section 39–12–1 expresses the intent of the General Assembly "to regulate transportation of property by motor carriers" and "foster sound economic conditions." One way the General Assembly chose to achieve these goals was to prohibit tow operators from paying a portion of their fee to any other party, thus preserving competition among the carriers. There is no indication that the General Assembly considered fee-sharing with a city to be less invidious than a refund or remittance to an individual vehicle owner.