STATE ex rel. CITY OF
PROVIDENCE

v.

Troy AUGER.

No. 2010–169–C.A.

Supreme Court of Rhode Island.

June 6, 2012.

Megan K. Maciasz, Esq., for Plaintiff.

Andrew Horowitz, Esq., for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

On February 23, 2010, a justice of the Superior Court found Troy Auger guilty of having violated Article III, § 16–93 of the Code of Ordinances of the City of Providence. On appeal to this Court, the defendant has set forth the following contentions: (1) that § 16–93 is preempted as a matter of law—both because it allegedly is in direct conflict with state statutes regulating noise and also because it allegedly invades a regulatory field that is completely occupied by the state; (2) that § 16–93 of the Providence Code of Ordinances is unconstitutional because it is impermissibly vague; and (3) that § 16–93 is unconstitutional because it is overly broad.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

### A

### Section 16–93 of the Providence Code of Ordinances

Section 16–93 of the Providence Code of Ordinances is the provision that defendant is challenging in this case. It is entitled "Radios, television sets, and similar devices." The body of that ordinance reads as follows:

"It shall be unlawful for any person within any residential zone of the city to use or operate any radio receiving set, musical instrument, phonograph, television set, or other machine or device for the producing or reproducing of sound in such a manner as to disturb the peace, quiet and comfort of neighborhood residents or of any reasonable person of normal sensitivity residing in the area. The operation of any such set, instrument, phonograph, machine or device so as to exceed fifty (50) dBA between the hours of 8:00 p.m. and 7:00 a.m. or so as to exceed fifty-five (55) dBA between the hours of 7:00 a.m. and 8:00 p.m. measured at the property line of the building, structure or vehicle in which it is located, or at any hour when the same is audible to a person of rea-sonably sensitive hearing at a distance of two hundred (200) feet from its source, shall be prima facie evidence of a violation of this section." Section 16–93.[1]

### B

### The Defendant's Alleged Violation and His Motion to Dismiss

On February 6, 2009, defendant filed in the Providence Municipal Court a claim of appeal to the Superior Court with respect to a ruling that had been made by the Municipal Court on January 21, 2009. In that ruling, a judge of the Municipal Court had found that defendant was guilty of a charge filed by the City of Providence, which charge alleged that defendant had violated § 16–93 as a result of the emanation of "loud music from [his] veh[icle]." The fine that was assessed for that violation was $200.

Thereafter, defendant filed in the Superior Court a motion to dismiss the alleged charge on the grounds that the ordinance was void and unenforceable as a matter of law. Specifically, defendant contended that the ordinance was unconstitutionally vague and overbroad, thereby violating both article 1, section 21 of the Rhode Island Constitution[2] and the First Amend-

1. Article III, § 16–92(1) of the Code of Ordinances of the City of Providence defines "[s]ound level (noise level) in decibels" as "[t]he level measured on the A-weighted scale as defined in the American National Standards S–1.4–1071."

 The abbreviation "dB" stands for decibel, which has been defined as "[a] unit used to express relative difference in power or intensity, usually between two acoustic or electric signals * * *." The American Heritage Dictionary of the English Language 470 (4th ed.2009). The abbreviation dBA recognizes the "A scale," which was "(devised to give greater weight to high-pitched sounds, which are more annoying to the human ear than low-pitched sounds)." James L. Hildebrand, *Noise Pollution: An Introduction to the Problem and an Outline for Future Legal Research,* 70 Colum. L.Rev. 652, 652–53 (1970); *see also* Aaron C. Dunlap, *Come on Feel the Noise: The Problem with Municipal Noise Regulation,* 15 U. Miami Bus. L.Rev. 47, 51 n. 20 (2006) (stating that "dBA (also called A weighted sound level) is adjusted for the sensitivity to the human hearing capacity for different frequencies").

2. Article 1, section 21 of the Rhode Island Constitution reads as follows: "The citizens have a right in a peaceable manner to assemble for their common good, and to apply to those invested with the powers of govern-

ment to the United States Constitution;[3] defendant also averred that the ordinance was preempted by state statutory law.

On July 14, 2009, a hearing was held in the Superior Court on the motion to dismiss. After hearing the arguments of the parties, the hearing justice declined to dismiss the charge on the ground of preemption. The hearing justice based his rejection of the preemption argument on (1) article 13 of the Rhode Island Constitution[4] and (2) the hearing justice's conclusion that the ordinance was not inconsistent with state law and "that there is at least some ability under [the] General Laws * * * for cities and towns to regulate noise."

With respect to defendant's constitutional arguments, the hearing justice opined that the ordinance was "particularly well drafted." The hearing justice made particular note of the fact that the ordinance contains "specific components with regard to decibel levels at 200 feet." Accordingly, the hearing justice denied the motion to dismiss.

## C

### The Trial

On February 9, 2010, a *de novo* trial was held in the Superior Court. At the outset, the trial justice noted on the record that the above-referenced motion to dismiss had been denied by a justice of the Superi-

or Court; he further stated that "the issues raised in that motion to dismiss ha[d] become law of the case and [that he] need not reconsider those issues as part of [his] determinations * * *."

At the *de novo* trial, the City of Providence called as a witness Providence Patrolman James Barros. He testified that, on Saturday May 25, 2008, at approximately 10:12 p.m., he was parked in a parking lot, which he described as being "adjacent to" Chalkstone Avenue and Aldine Street in Providence; he stated that he was in a marked patrol vehicle with the windows open. He testified that, at that point in time, he began to hear "a sound of extremely loud music approaching [his] location." Patrolman Barros stated that he then realized that the music was coming from a moving vehicle; he further stated that he "sensed the music was too loud for the neighborhood considering the time and the location." The patrolman testified that he pulled out from the parking lot and stopped the vehicle. Patrolman Barros then made an in-court identification of defendant as having been the driver of the vehicle. The patrolman further testified that, on the evening in question, he presented defendant with a ticket relating to his alleged violation of the noise ordinance.

Patrolman Barros testified that, on a subsequent date, he returned to the place where the alleged violation had occurred and photographed the location "from [his]

---

ment, for redress of grievances, or for other purposes, by petition, address, or remonstrance. No law abridging the freedom of speech shall be enacted."

3. The First Amendment to the United States Constitution reads as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

4. Article 13 of the Rhode Island Constitution is entitled "Home Rule for Cities and Towns." The purpose of that constitutional provision is "to grant and confirm to the people of every city and town in this state the right of self government in all local matters." R.I. Const. art. 13, sec. 1; *see State ex rel. Town of Westerly v. Bradley,* 877 A.2d 601, 607 (R.I. 2005).

vantage point." The patrolman stated that he also measured the distance from the location where he had been parked on May 25 to the telephone poles where on that date he had observed defendant's vehicle and heard the sounds that were emanating from that vehicle. He stated that the distance from his vantage point to that telephone pole was 227 feet (227 feet being a greater distance than the ordinance's 200–foot criterion).

The City of Providence also called as a witness Kerry Anderson, the building official for the City of Providence Department of Inspections and Standards. The building official testified that the area in which the stop took place was primarily zoned R–1 and R–2—both of which zones are designated for residential development. The building official further stated that the area in which the stop took place was also partially zoned C–1; areas with that zoning designation are "intended for neighborhood commercial/residential areas that primarily serve local neighborhood needs for convenience retail, services[,] and professional office establishments."

The defendant did not present any witnesses or other evidence on his behalf at the Superior Court trial; instead, he again moved to dismiss the case. In his motion to dismiss, defendant argued that there was a question as to "whether the [c]ity ha[d] established its proof that the alleged violation took place within a residential zone of the city." The defendant further contended that the city had not presented any testimony to the effect that Patrolman Barros is a person of "reasonably sensitive hearing."[5] In addition, defendant challenged the measurements and distance cal-

culations that had been presented to the court. The defendant then proceeded to argue that, if the city failed to make out a *prima facie* case of a violation of the ordinance at issue, then "what you're left with is the broad elements" of the ordinance, which elements he summarized to be whether "the volume [being such] that it disturbed the peace, quiet and comfort of neighborhood residents."

On February 23, 2010, the trial justice rendered his decision. He again noted that, with respect to the initial motion to dismiss (heard on July 14, 2009), he was "bound by [the] determination [of that motion to dismiss] under the doctrine of law of the case." The trial justice stated that, as a result, he would not revisit the issues that had been raised in that initial motion to dismiss. The trial justice then held that the city had made out a *prima facie* violation of the ordinance in view of the fact (1) that he found that the patrolman had heard the noise at a distance of 227 feet and (2) that he "did not observe that Officer Barros' hearing was more sensitive than a reasonable person's hearing." Accordingly, the trial justice stated that it was not necessary for him to make findings with respect to the remainder of the ordinance—*i.e.*, whether the noise was sufficient "to disturb the peace, quiet and comfort of neighborhood residents or of any reasonable person of normal sensitivity residing in the area." *See* § 16–93. Given his finding of a *prima facie* violation of the ordinance, the trial justice affirmed the conviction and the fine of $200.

■ The defendant filed a timely notice of appeal to this Court.[6] On appeal, defen-

---

5. The language that is quoted in the text is from § 16–93 of the Providence Code of Ordinances, which section is quoted in its entirety in Section I A of this opinion, *supra*.

6. Although defendant filed his notice of appeal prior to the entry of final judgment, we consider it timely because "this Court has stated that it will treat a premature appeal as if it had been timely filed." *Chapdelaine v.*

dant contends (1) that § 16–93 of the Providence Code of Ordinances is preempted as a matter of law by certain state statutes; (2) that the Providence ordinance is impermissibly vague; and (3) that the ordinance is overly broad.

## II

### Standard of Review

Because a municipal ordinance is at the center of this case, we note that "[w]hen interpreting an ordinance, we employ the same rules of construction that we apply when interpreting statutes." *Ruggiero v. City of Providence*, 893 A.2d 235, 237 (R.I.2006); *see also Pierce v. Providence Retirement Board*, 15 A.3d 957, 963 (R.I.2011); *Murphy v. Zoning Board of Review of South Kingstown*, 959 A.2d 535, 541 (R.I.2008). And, it is a fundamental principle that this Court reviews questions of statutory interpretation in a *de novo* manner. *See Nunes v. Meadowbrook Development Co.*, 24 A.3d 539, 542 (R.I.2011); *see also Curtis v. State*, 996 A.2d 601, 604 (R.I.2010); *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001). Moreover, it is axiomatic that, if an ordinance is clear and unambiguous, it should be enforced as written, with the words of the ordinance being given their plain and ordinary meaning. *See Ruggiero*, 893 A.2d at 237; *see also Murphy*, 959 A.2d at 541.

When we review a challenge to a statute or ordinance, we begin with a presumption that the enactment is constitutional. *State v. Russell*, 890 A.2d 453, 458 (R.I.2006); *see also State ex rel. Town of Westerly v. Bradley*, 877 A.2d 601, 605 (R.I.2005). Indeed, "[t]his [C]ourt will attach every reasonable intendment in favor of * * * constitutionality in order to preserve the statute." *Gem Plumbing & Heating Co. v. Rossi*, 867 A.2d 796, 808 (R.I.2005) (second alteration in original) (internal quotation marks omitted); *see also Bradley*, 877 A.2d at 605; *Casa DiMario, Inc. v. Richardson*, 763 A.2d 607, 616 (R.I.2000).

Finally, we are mindful of the principle that the party contesting constitutionality bears "the burden of proving beyond a reasonable doubt that the challenged enactment is unconstitutional." *See Bradley*, 877 A.2d at 605; *see also Russell*, 890 A.2d at 458; *Rossi*, 867 A.2d at 808.

## III

### Analysis

#### A

#### The Alleged Lack of Jurisdiction of the Superior Court

In its brief to this Court and at oral argument, the city has contended that the Superior Court lacked jurisdiction over defendant's appeal. The city bases that contention on the underlying contention that defendant was convicted of a violation that was not criminal in nature and that, therefore, he did not have a right to appeal to the Superior Court. The city argues that, instead of seeking review in the Superior Court, defendant should have petitioned this Court for a writ of certiorari so as to seek review of the disposition of his case by the Municipal Court.

General Laws 1956 § 12–22–9 governs appeals from municipal courts. Pursuant to chapter 22 of title 12, every person aggrieved by a judgment of a municipal court for any offense other than a violation may

*State*, 32 A.3d 937, 941 n. 1 (R.I.2011) (internal quotation marks omitted); *see also Toe-* *gemann v. City of Providence*, 21 A.3d 384, 386 n. 3 (R.I.2011).

appeal to the Superior Court. *See* § 12–22–1; § 12–22–9. In contrast, if an individual is aggrieved "by the imposition of a fine by the [D]istrict [C]ourt upon the finding of a violation," he or she may petition the Supreme Court for a writ of certiorari to review any alleged errors involved in that imposition of a fine. Section 12–22–1.1.

 In deciding whether the Superior Court had subject matter jurisdiction over defendant's appeal, we must determine whether defendant was convicted of an offense for which he had a right to a jury trial. *See, e.g., Aptt v. City of Warwick Building Department,* 463 A.2d 1377, 1378 (R.I.1983) (stating that the sole issue before the Court was "whether or not [the] defendant, who ha[d] been convicted of a zoning violation, ha[d] a right to a de novo trial by jury in the Superior Court"); *State v. Vinagro,* 433 A.2d 945, 945–46 (R.I.1981) (stating that one of the defendant's arguments on appeal was that the statute authorizing direct review of the District Court's judgment by way of certiorari, in the context of an animal cruelty charge, violated the defendant's right to a jury trial). It is well established that "a jury trial is required for those defendants who have been convicted of a violation that is 'criminal in nature.'" *Aptt,* 463 A.2d at 1378 (quoting *Vinagro,* 433 A.2d at 949). In determining whether a particular charge triggers the right to a jury trial,[7] we consider whether the offense at issue or an analogous offense was triable by jury at the time of the adoption of the Rhode Island Constitution or at common law. *See FUD's, Inc. v. State,* 727 A.2d 692, 695 (R.I.1999); *see also Calore Freight Systems, Inc. v. State of Rhode Island, De-*

*partment of Transportation,* 576 A.2d 1214, 1215 (R.I.1990); *Aptt,* 463 A.2d at 1378; *Vinagro,* 433 A.2d at 946–47. *See generally* Colleen P. Murphy, *The Narrowing of the Entitlement to Criminal Jury Trial,* 1997 Wisconsin L.Rev. 133, 173 & n. 180 (noting that Rhode Island is one of the "[f]our states [that] guarantee jury trial of offenses that were triable at the time of the adoption of the relevant state constitutional provisions").

In our previous analyses concerning the right to a jury trial, we have determined some violations to be of a criminal nature and others to be of a civil nature. *See Aptt,* 463 A.2d at 1379; *Vinagro,* 433 A.2d at 947.

In *Aptt,* 463 A.2d at 1379, we concluded that the zoning violation at issue was "not commensurate with a finding of 'criminal in nature' for purposes of determining whether or not a jury trial is warranted." We distinguished the zoning violation at issue in *Aptt* from the animal cruelty conviction that had been at issue in the earlier *Vinagro* case. *Id.* at 1378–79 (discussing the analysis employed in the *Vinagro* opinion). We noted in *Aptt, inter alia,* that the defendant in the *Vinagro* case was arrested and his property seized pursuant to a search warrant. *See id.* at 1379. We then stated in *Aptt* that "no such indicia of criminality" were present in the latter case; consequently, we held that the defendant had no constitutional right to a *de novo* jury trial in Superior Court. *See id.*

The instant case presents indicia of criminality similar to those that we determined were present in *Vinagro.* For example, defendant in this case appeared in Municipal Court pursuant to a summons issued by a Providence police officer.

---

7. While conducting the analysis that is described in the text, we have remained mindful that the fact that the ordinance does not contain an explicit reference to a *"de novo* ap-

peal" or to a "jury trial" is not determinative. *See State v. Vinagro,* 433 A.2d 945, 947 (R.I. 1981).

Moreover, the patrolman who pulled over defendant's vehicle was required to have probable cause that a traffic violation had occurred. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("As a general matter, the decision to stop an automobile is reasonable [as required by the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred."); *State v. Quinlan,* 921 A.2d 96, 106 (R.I.2007) ("It is well established that a traffic stop, regardless of how brief and limited, constitutes a seizure for Fourth Amendment purposes, and thus must be reasonable under the circumstances. * * * A stop is reasonable if the officer has probable cause to believe that a traffic violation has occurred." (internal quotation marks omitted)). *See generally* William E. Ringel, *Searches & Seizures, Arrests and Confessions* § 11:13 at 11–60 (2d ed. 2012) ("When an officer has probable cause to believe a traffic violation has occurred or a vehicle or licensing provision is being violated, he has the right to stop the vehicle. Some courts have indicated that a traffic stop is permissible even when the officer has only a reasonable suspicion that a violation of the traffic or motor vehicle regulations has occurred." (footnote omitted)). The circumstances in the instant case are plainly distinguishable from those surrounding the zoning violation in *Aptt,* in which the defendant was charged with using land zoned for residential use as "a base for a tree-service business," in view of the fact that that case contained none of the indicia of criminality present in the case at bar. *See Aptt,* 463 A.2d at 1377.

It is noteworthy that, in title 11 of the General Laws, entitled "Criminal Offenses," the General Assembly has similarly prohibited disturbances of "another person by making loud and unreasonable noise which under the circumstances would disturb a person of average sensibilities" in a public place or "near a private residence that [the person causing the disturbance] has no right to occupy." G.L.1956 § 11–45–1(a)(2). If a person is convicted under that statute, he or she "shall be imprisoned for a term of not more than six (6) months, or fined not more than five hundred dollars ($500), or both." Section 11–45–1(c).

The just-referenced Rhode Island statute by no means reflects a modern or postmodern novel desire to criminalize the making of loud and unreasonable noise. Indeed, the evolution of the law with respect to nuisances is evidenced by the compilers' notes which accompanied the statute when it was enacted by the General Assembly in 1979. Those notes explain that a distant antecedent of the statute was "English legislation of the feudal era when vagrancy laws served both to deter serfs from leaving their lords as well as to control scarce labor in the aftermath of the plagues that swept England in the fourteenth century." *See* "EXPLANATION," (accompanying) P.L.1979, ch. 304. The explanation further indicates that "[s]ubsequently, [those] statues were expanded and used to control wandering bands of robbers as well as beggars." *Id.* The compilers' notes go on to state that the original version of § 11–45–1—which covered "vagrancy, drunkard[ness], disorderly conduct and a plethora of minor offenses," in addition to status crimes—was similar to statutes which the United States Supreme Court had held to be "unconstitutionally vague as well as to infringe rights of free speech and assembly." Explanation to P.L.1979, ch. 304. The General Assembly accordingly redrafted the statute "so as to explicitly define the prohibited conduct while not intruding upon constitutionally protected activities." *Id.* The statute, however, is still designed to prescribe

types of conduct which are considered to be breaches of the peace or which create serious nuisances. *See id.*

As a result of both Rhode Island's present criminalization of the undue amplification of sound and the common law history of such criminalization, it is clear to us that the violation of which defendant was accused was one for which he had a right to a jury trial. *See generally State v. Russell*, 447 A.2d 1139, 1139 (R.I.1982) (mem.) (stating that, pursuant to the Court's holding in *Vinagro*, a conviction on a charge of "loitering for indecent purposes" was appealable *de novo* to the Superior Court). Accordingly, we are of the opinion that the Superior Court, as a matter of law, did have jurisdiction over defendant's appeal.

### B

### The Alleged Preemption by State Law

■■■ The defendant asserts that § 16–93 is preempted by state law. A municipal ordinance is preempted by statute "when either the language in the ordinance contradicts the language in the statute or when the [General Assembly] has intended to thoroughly occupy the field." *Coastal Recycling, Inc. v. Connors*, 854 A.2d 711, 715 (R.I.2004) (internal quotation marks omitted); *see also URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 7 (1st Cir.2011) (applying principles of Rhode Island law regarding preemption); *Amico's Inc. v. Mattos*, 789 A.2d 899, 907 (R.I. 2002). *See generally* 1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 30:1 at 658 (7th ed.2009). The defendant bases his preemption contention on the following two arguments: (1) that § 16–93 is in direct conflict with G.L.1956 § 11–45.1–2 and G.L.1956 § 31–45–5; and (2) that § 16–93 invades a field of regulation that is fully occupied by state law.

### 1. Direct and Material Conflict

■■■■ An ordinance is invalid when it is "in direct and material conflict with a state law." *Town of Glocester v. R.I. Solid Waste Management Corp.*, 120 R.I. 606, 607, 390 A.2d 348, 349 (1978). The presence or absence of such a conflict "depends on what the Legislature intended when it enacted the statute." *Id.*[8] *See generally Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (stating that conflict preemption may exist when it is "impossible for a * * * party to comply with both * * * requirements" or when a "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the Legislature]" (internal quotation marks omitted)).

■■■ The defendant argues that § 16–93 directly conflicts with § 11–45.1–2 of the General Laws. That section of the General Laws provides as follows:

"It shall be unlawful for any person to operate any equipment as set forth in § 11–45.1–1 from which the sound created by this equipment is capable of penetrating a closed vehicle from twenty (20) feet away from the location at which the sound is being generated, or heard from one hundred (100) feet away by a person outside from which the sound is originating. This section shall include,

---

**8.** In ascertaining legislative intent, we are at all times mindful of the important principle that "[t]he plain statutory language is the best indicator of legislative intent." *See State v. Santos*, 870 A.2d 1029, 1032 (R.I.2005); *see also Martone v. Johnston School Committee*, 824 A.2d 426, 431 (R.I.2003); *Little v. Conflict of Interest Commission*, 121 R.I. 232, 237, 397 A.2d 884, 887 (1979) ("It is a primary canon of statutory construction that *statutory intent is to be found in the words* of a statute, if they are free from ambiguity and express a reasonable meaning." (emphasis added)).

but not be limited to, sound electronically generated by autos, trucks, motor homes, mobile homes, houses, apartment buildings, condominiums, commercial buildings, or from any type of portable sound producing equipment that can be carried or placed outdoors which through its operation exceeds the provision of this chapter. All state and municipal vehicles shall be exempt from the provisions of this chapter, nor any person firm, corporation or other legal entity which holds a valid state or municipal entertainment license to sponsor a parade, carnival or other similar special event." Section 11–45.1–2.

The defendant additionally contends that § 16–93 directly conflicts with § 31–45–5 of the General Laws. That section of the General Laws reads in part as follows:

"It shall be unlawful for any motor vehicle with a radio, stereo or audio system to produce sound which exceeds those limits specified in this chapter. Police cars, ambulances and fire engines shall not be subject to this section. Local cities and towns may, at their discretion, issue temporary exemption by special permit upon a showing of good cause." Section 31–45–5.

It is our opinion that § 16–93 is not in conflict with either § 11–45.1–2 or § 31–45–5. Instead of conflicting with the cited statutory provisions, § 16–93 actually furthers the General Assembly's policy (as that policy is articulated in the cited statutes) by creating a *specific* standard for a *particular* set of devices in a *specific* area. We accordingly conclude that the requirements of § 16–93 control a specific type of noise—that which emanates from certain devices and which is unreasonably loud in a residential area—in furtherance of the

objectives of state law, rather than being in conflict with the less exigent provisions of § 11–45.1–2 or § 31–45–5.

### 2. Occupy the Field of Regulation

To determine whether state law preempts a municipal ordinance, we must also consider "whether the General Assembly intended that its statutory scheme completely occupy the field of regulation on a particular subject." *Grasso Service Center, Inc. v. Sepe*, 962 A.2d 1283, 1289 (R.I.2009) (internal quotation marks omitted); *see also Providence Lodge No. 3, Fraternal Order of Police v. Providence External Review Authority*, 951 A.2d 497, 504 (R.I.2008); *Coastal Recycling, Inc.*, 854 A.2d at 715. The defendant contends that § 16–93 cannot coexist with state law because § 11–45.1–2 and § 31–45–5 have "statewide application[s]" and are not limited in their reach, "indicating that [noise] is a statewide concern." In addition, defendant avers that municipal noise ordinances will create inconsistent regulation which could undermine the legislative intent that is reflected in the cited statutes.

■■■■■■ In considering defendant's contention with respect to field preemption, it must be determined whether, with respect to the regulation of noise, it was *the expressed intent* of the General Assembly that "the state control is to be exclusive or whether the control is to be exercised concurrently by the state and by the municipality." *Wood v. Peckham*, 80 R.I. 479, 483, 98 A.2d 669, 671 (1953); *see also Grasso Service Center, Inc.*, 962 A.2d at 1290 ("When interpreting a statute, this Court's task is to give effect to the expressed intent of the General Assembly.").[9]

The General Assembly chose to employ a rifle rather than a shotgun when it enact-

---

9. Neither G.L.1956 § 11–45.1–2 nor G.L.1956 § 31–45–5 contains an express reservation of power over the regulation of noise. *See Amico's Inc. v. Mattos*, 789 A.2d 899, 907 (R.I.

2002). Nevertheless, we realize that such a reservation "need not necessarily be express; rather, it may be implied in the legislative scheme." *Id.*

ed the two statutes cited by defendant with respect to the subject matter of excessive noise from personal broadcasting devices; it certainly did not enact a "complex regulatory scheme," as occurred in the cases in which we have held that the General Assembly intended to occupy the field. *See, e.g., Town of East Greenwich v. O'Neil,* 617 A.2d 104, 110 (R.I.1992) (recognizing the "complex regulatory scheme" within the statute to be evidence of implied preemption). In addition, nowhere in the cited statutes did the General Assembly vest *"exclusive* power and authority" in one body [10] or set forth a comprehensive approach to regulation and enforcement through a statutory scheme. *See id.* at 109–10 (internal quotation marks omitted); *see also South County Gas Co. v. Burke,* 551 A.2d 22, 25 (R.I.1988); *In re Woonsocket Water Department,* 538 A.2d 1011, 1014 (R.I.1988).[11]

■ It is further our view that defendant's contention as to preemption cannot be readily reconciled with the language of

article 13 of the Rhode Island Constitution—that "[t]he people of every city and town in this state [have] the right of self government in all local matters." *See Coastal Recycling, Inc.,* 854 A.2d at 715; *see also Bradley,* 877 A.2d at 607–08 ("Cities and towns with home rule charters * * * are vested with the authority to legislate matters of public health and safety, * * * as long as those regulations are not inconsistent with the constitution or statutes of the state * * *."). In our judgment, noise in residential areas can be the subject of local regulation because it is "related directly to preserving the public peace, safety, comfort and welfare * * *." *Bradley,* 877 A.2d at 608.

For these reasons, it is our opinion that § 16–93 does not constitute an impermissible invasion of a field of regulation that has been fully occupied by state law.

### C

### The Void–for–Vagueness Contention

■ In light of our conclusion that § 16–93 is not preempted, we must now

---

**10.** We note that § 31–45–2 reads in pertinent part as follows:

"The director of the department of revenue is authorized to adopt rules, regulations, and procedures to be utilized in the enforcement of this chapter. The director is further authorized to lower the noise standards set forth in this chapter consistent with economic and technological feasibility. The procedure shall allow, to the extent feasible, noise measurement and enforcement action to be accomplished in reasonably confined areas such as residential areas."

That section, however, does not confer exclusive enforcement or regulatory power upon the department of revenue; it merely authorizes that department to adopt rules, regulations, and procedures (none of which have been presented to this Court by the parties to this case). Additionally, chapter 45.1 of title 11 contains no such delegation.

**11.** Further supporting our conclusion that the General Assembly has not manifested an in-

tent to occupy the field is the fact that, throughout the General Laws, the General Assembly has itself made reference to local noise ordinances without manifesting any disapproval of same. For example, G.L.1956 § 3–7–16.6(g)(1) provides that any establishment holding a Class N nightclub license must "[c]omply with *local ordinances* governing noise levels." (Emphasis added.) In addition, in providing a degree of immunity to rifle ranges, the General Assembly specified that "no court shall enjoin the use or operation of the [rifle] range on the basis of noise * * * provided the owner continues to be in compliance with any noise control law, *ordinance* or bylaws in effect * * *." G.L.1956 § 11–47–62(a) (emphasis added); *see also* § 11–47–62(b) (mentioning, with respect to rifle ranges, the "standards in rules adopted by any state, *city or town agency* for limiting levels of noise in terms of decibel level" (emphasis added)).

turn to defendant's constitutional contentions. The defendant asserts that § 16–93 is facially invalid because it is unconstitutionally vague. He bases that contention on his view that it fails to provide adequate notice of what is prohibited, leaves virtually unlimited discretion to the police, and chills the exercise of First Amendment rights. It is a well-established principle of due process "that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

 We begin by noting that, to succeed on a facial challenge to a law which has no effect on protected conduct, a challenger must demonstrate that "the enactment is impermissibly vague in *all* of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (emphasis added); *see also URI Student Senate,* 631 F.3d at 13; *Bradley,* 877 A.2d at 605. Nonetheless, in our review of an ordinance that "interferes with the right of free speech or association," *Holder v. Humanitarian Law Project,* —— U.S. ——, 130 S.Ct. 2705, 2719, 177 L.Ed.2d 355 (2010) (internal quotation marks omitted), we must remain mindful that such an ordinance can "exert a chilling effect that discourages individuals who are not present before the Court from exercising their First Amendment rights

for fear of arbitrary enforcement." *See DA Mortgage, Inc. v. City of Miami Beach,* 486 F.3d 1254, 1271 (11th Cir.2007); *see also Grayned,* 408 U.S. at 109, 92 S.Ct. 2294; *Keyishian v. Board of Regents of the University of the State of New York,* 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." (internal quotation marks omitted)); *National Organization for Marriage, Inc. v. McKee,* 669 F.3d 34, 43–44 (1st Cir.2012).

In reviewing the regulation of sound amplification by a loud speaker, sound truck, or sound amplifier (which we view as being a conceptually similar subject to what is at issue in the instant case, which involves sound devices most often employed for personal listening), the United States Supreme Court has recognized that the First Amendment protects "the right of a citizen to play music and express his views on matters which he considers to be of interest to · himself and others on a public street through sound amplification devices mounted on vehicles * * * * " [12] *See Kovacs v. Cooper,* 336 U.S. 77, 80–81, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (plurality opinion); *see also Saia v. New York,* 334 U.S. 558, 559–60, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (holding that the First Amendment protects the right "[t]o use a loud speaker or amplifier"); *Reeves v. McConn,* 631 F.2d 377, 382 (5th Cir.1980) ("The

---

**12.** At oral argument, the parties recognized that § 16–93 will often be applied to loud music—as occurred in the case at bar. We therefore have approached this case with a keen awareness of the following observation by the United States Supreme Court about music:

"Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. The Constitution prohibits any like attempts in our own legal order. Music, as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citations omitted).

right to communicate inherently comprehends the right to communicate effectively."). As such, in our review of § 16–93, which regulates the emanation of noise from devices that broadcast sound, we remain mindful that "[f]reedom of speech, freedom of assembly[,] and freedom to communicate information and opinion to others are all comprehended on this appeal * * *." *See Kovacs*, 336 U.S. at 81, 69 S.Ct. 448.

Nonetheless, this Court also remains mindful of the government's "substantial interest in protecting its citizens from unwelcome noise." *See Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotation marks omitted); *see also City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (stating that the jurisprudence of the Supreme Court recognizes that "municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression"); *Kovacs*, 336 U.S. at 86–87, 69 S.Ct. 448 ("The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. In his home or on the street he is practically helpless to escape [the] interference with his privacy by loud speakers except through the protection of the municipality." (footnote omitted)).[13] With respect to what the Supreme Court has called the government's "substantial interest in protecting its citizens from unwelcome noise," the Court has stated that that "interest is perhaps *at its greatest* when government seeks to protect the *well-being, tranquility, and privacy of the home,* but it is by no means limited to that

context, for the government may act to protect even such traditional public forums as city streets and parks from excessive noise." *Ward*, 491 U.S. at 796, 109 S.Ct. 2746 (emphasis added) (citations and internal quotation marks omitted); *see also Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

■ The void-for-vagueness doctrine emanates from the due process requirements that a law must be defined "[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Skilling v. United States*, — U.S. ——, 130 S.Ct. 2896, 2927–28, 177 L.Ed.2d 619 (2010); *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *Connally v. General Construction Co.*, 269 U.S. 385, 391–92, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Russell*, 890 A.2d at 459; *Bradley*, 877 A.2d at 605.

### 1. The "Sufficient Definiteness" Requirement

■ The first requirement—that which requires "sufficient definiteness" in a law—is intended to furnish the ordinary citizen "with the information necessary to conform his or her conduct to the law." *Bradley*, 877 A.2d at 605 (internal quotation marks omitted); *see also Village of Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186 ("Vague laws may trap the innocent by not providing fair warning." (internal quotation marks omitted)); *Grayned*, 408 U.S. at 109, 92 S.Ct. 2294 (stating that a vague law leads "citizens to steer far

---

13. *See generally* Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing*, 97 Colum. L.Rev. 551, 614 n. 301 (1997) ("In practice, the Supreme Court has

shown significant deference to content-neutral legislation promoting the state's substantial interest in protecting its citizens from unwelcome noise." (internal quotation marks omitted)).

wider of the unlawful zone * * * than if the boundaries of the forbidden areas were clearly marked" (internal quotation marks omitted)); *Russell,* 890 A.2d at 459.

██ Examining the language of § 16–93,[14] we are entirely unable to conclude that the ordinance is so vague that persons of ordinary intelligence cannot understand what conduct is being prohibited. We realize that human language is a less than perfect medium; as the Supreme Court has memorably commented: "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294; *see also Ward,* 491 U.S. at 794, 109 S.Ct. 2746 (stating that "perfect clarity and precise guidance have never been required"); *URI Student Senate,* 631 F.3d at 14 (observing that words are "rough-hewn tools, not surgically precise instruments" and stating that "[c]onsequently, some degree of inexactitude is acceptable in statutory language").

It is noteworthy that the Supreme Court has recognized that the terms "loud and raucous" within an ordinance are not inherently vague; the Court reached that conclusion on the basis of the reasoning that, although they "are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Kovacs,* 336 U.S. at 79, 69 S.Ct. 448. Similarly, with respect to the ordinance before us, some of the terms

employed therein may be abstract to some extent; but, when the ordinance is read in its entirety, it conveys a sufficiently accurate concept of what is forbidden—by referencing a person's everyday understanding of what constitutes a volume of sound that would "disturb the peace, quiet and comfort of neighborhood residents."

Section 16–93 is also specific as to the geographic area in which a violation may occur—*viz.,* "any residential zone of the city." As a result, a person of ordinary intelligence can comprehend (1) the actual areas in which § 16–93 is applicable and (2) the type of volume that would constitute a violation of the ordinance (*viz.,* one which may disturb people in their homes).

Additionally, although the terms in the Providence ordinance are marked by "flexibility and reasonable breadth," the ordinance as a whole provides an ordinary person with sufficiently definite criteria as to what constitutes a violation. *See Grayned,* 408 U.S. at 110–11, 92 S.Ct. 2294. Specifically, § 16–91 sets forth the policy underlying chapter 16 in the following words:

"It is hereby declared to be the policy of the city to prohibit unnecessary, excessive, and annoying noise from all sources subject to its police power. At certain levels, noises are detrimental to the health and the welfare of the citizenry; therefore, in the public interest, such noises shall be systematically proscribed." [15]

---

14. *See* Section I A of this opinion, *supra.*

15. Section 16–92(13) defines "[u]nnecessary, excessive, or offensive noise" (which terms are employed similarly in § 16–91, which is quoted in the text) as follows:

"Any sound or noise conflicting with the criteria, standards, or levels set forth in this article for permissible noises. In the absence of specific maximum noise levels, a noise level which exceeds the ambient noise

level by five (5) dBA or more, when measured at the nearest property line or, in the case of multiple-family residential buildings, when measured anywhere in one dwelling unit with respect to a noise emanating from another dwelling unit or from common space in the same building, or a noise audible to a person of reasonably sensitive hearing at a distance of two hundred (200) feet from its source, shall be

That section conveys to the ordinary person that a governmental goal is limiting what has come to be known as "noise pollution"[16] due to the fact that it is deemed to be "detrimental to the health and welfare of the citizenry." *Id.*

In our judgment, the ordinance plainly "delineates its reach in words of common understanding." *See Grayned,* 408 U.S. at 112, 92 S.Ct. 2294 (internal quotation marks omitted); *see also Cameron v. Johnson,* 390 U.S. 611, 616, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

### 2. The Avoidance of Arbitrary and Discriminatory Enforcement

■ We turn next to the second prong of the void-for-vagueness doctrine, which prohibits enactments that "encourage arbitrary and discriminatory enforcement." *See Kolender,* 461 U.S. at 357, 103 S.Ct. 1855. That prohibition serves to "prevent standardless sweep[s]" such as would allow "policemen, prosecutors, and juries to pursue their personal predilections." *Bradley,* 877 A.2d at 605 (internal quotation marks omitted); *see also Grayned,* 408 U.S. at 108–09, 92 S.Ct. 2294 ("A vague

law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."); *Russell,* 890 A.2d at 459.

■ After carefully scrutinizing § 16–93, we perceive no basis for concluding that it encourages arbitrary and discriminatory enforcement. Indeed, the standard of "reasonableness"[17] that the Providence ordinance employs is one that a plethora of courts have upheld as constituting a standard which is not void for vagueness. *See, e.g., Cameron,* 390 U.S. at 616, 88 S.Ct. 1335 (reviewing a Mississippi anti-picketing statute); *DA Mortgage, Inc.,* 486 F.3d at 1272 (reviewing a Miami Beach noise ordinance); *Reeves,* 631 F.2d at 385–86 (construing Houston's ordinances relative to sound amplification equipment); *People v. Fitzgerald,* 194 Colo. 415, 573 P.2d 100, 102–04 (1978) (reviewing a Colorado statute relative to disorderly conduct); *People v. Bakolas,* 59 N.Y.2d 51, 462 N.Y.S.2d 844, 449 N.E.2d 738, 740 (1983) (construing a New York state penal law prohibiting "unreasonable noise"); *City of Seattle v.*

---

deemed a prima facie violation of this article."

**16.** The Environmental Protection Agency (EPA) defines "noise pollution" as "unwanted or disturbing sound," which "can have major consequences, primarily to one's overall health." United States Environmental Protection Agency, Air and Radiation, "Noise Pollution," http://www.epa.gov/air/noise.html (last visited June 4, 2012). The EPA further explains that noise pollution has adversely affected "the lives of millions of people." *Id.* According to that agency, health problems related to noise include the following: "stress related illnesses, high blood pressure, speech interference, hearing loss, sleep disruption, and lost productivity." *Id.*

We have been unable to ascertain precisely when the term "noise pollution" first became part of the vernacular. We note, however,

that the term appears in the title of an article published more than forty years ago in a leading law review. *See* James L. Hildebrand, *Noise Pollution: An Introduction to the Problem and an Outline for Future Legal Research,* 70 Colum. L.Rev. at 652 ("There is a growing public awareness and even some progress in the fight against air and water pollution, but a third jeopardy—*noise pollution*—has only recently begun to gain attention." (emphasis in original)).

**17.** The term *reasonable* has been defined as meaning "[n]ot excessive or extreme; fair." The American Heritage Dictionary of the English Language 1457 (4th ed.2009); *see* The Random House Dictionary of the English Language 1608 (2d ed.1987) (stating that "[r]easonable most often means sensible"); *see also* Black's Law Dictionary 1379 (9th ed.2009) (defining reasonable as "[f]air, proper, or moderate under the circumstances").

*Eze,* 111 Wash.2d 22, 759 P.2d 366, 369–70 (1988) (reviewing a Seattle ordinance which prohibited disorderly conduct on a bus); *City of Madison v. Baumann,* 162 Wis.2d 660, 470 N.W.2d 296, 302 (1991) (construing a noise ordinance of the City of Madison, Wisconsin). It is noteworthy that the Supreme Court has stated that the term "unreasonably" is "a widely used and well understood word \* \* \*." *Cameron,* 390 U.S. at 616, 88 S.Ct. 1335. In the instant case, a violation of the statute occurs when there is the emanation of a volume of noise from devices which broadcast sound that, under the circumstances, a person (defined as one who is "not excessive or extreme") could not tolerate. *See Bakolas,* 462 N.Y.S.2d 844, 449 N.E.2d at 740. We are therefore of the opinion that the "reasonable person" language sets forth a straightforward and constitutionally sustainable standard for the enforcement of § 16–93.

Further bolstering the constitutionality of the Providence ordinance is the fact that, through its *prima facie* evidence provision, the ordinance provides specific guidance for those called upon to enforce it. The ordinance specifies impermissible dBA levels at certain times and from certain distances as constituting such *prima facie* evidence. That specific guidance sets forth an *objective* standard, which is clearly a bulwark against arbitrary and discriminatory enforcement. *See DA Mortgage, Inc.,* 486 F.3d at 1272 (stating that a county noise ordinance which provides a "rebuttable presumption" as an "additional standard to guide those tasked with en-

forcing the ordinance" constitutes an objective standard).

Accordingly, this Court perceives no basis for holding that § 16–93 is void for vagueness because (1) the ordinance is defined with sufficient definiteness that ordinary people can understand what level of volume is prohibited and (2) it is defined in a manner that does not encourage arbitrary and discriminatory enforcement.

### 3. The Public Nuisance Cases

In support of his void-for-vagueness contention, defendant relies on this Court's holdings in *State v. Hendershot,* 415 A.2d 1047 (R.I.1980) (reviewing an East Greenwich ordinance); *State v. Berker,* 114 R.I. 72, 328 A.2d 729 (1974) (reviewing a Warwick ordinance); and *State v. Jamgochian,* 109 R.I. 17, 279 A.2d 923 (1971) (reviewing a Providence ordinance). In those cases, we held that certain "public nuisance" ordinances were unconstitutionally vague. In *Hendershot,* for example, we determined the following East Greenwich ordinance to be void for vagueness:

> "Every person who shall commit any nuisance, or who shall be found quarreling, fighting, reveling, screaming, or wantonly making a false alarm or cry of fire, or otherwise behaving in a noisy, disorderly or indecent manner in the town, to the disturbance or annoyance of the peaceable inhabitants thereof or any portion of them, or shall aid, assist, encourage or promote the same to be done by any other person or persons, shall be guilty of an offense." *Hendershot,* 415 A.2d at 1048 n. 1 (quoting East Greenwich Ordinance ch. 15, § 1 (1972)).[18]

---

**18.** The Warwick ordinance at issue in *State v. Berker,* 114 R.I. 72, 328 A.2d 729 (1974), provided as follows:

"Any person who shall be found reveling, quarreling, fighting or wantonly making a false alarm or cry of fire or otherwise behaving in a disorderly or indecent manner

in the city or who shall aid, incite or encourage the same to be done shall be guilty of a violation of this section." *Id.* at 73 n. 1, 328 A.2d at 730 n. 1 (quoting section 14–10 of the Warwick City Ordinances).

The Providence anti-loitering ordinance that defendant was charged with violating in

The ordinances at issue in those cases are markedly different from the ordinance at issue in the present case. In contrast to the ordinances at issue in the above-referenced public nuisance cases, § 16–93 of the Providence Code of Ordinances contains language that (1) plainly delineates the area in which the noise is prohibited; (2) sets forth a reasonableness standard; and (3) provides guidance for law enforcement officers through its *prima facie* evidence provision. Moreover, unlike the East Greenwich and Providence ordinances that were reviewed in the cases cited by defendant, § 16–93 does *not* employ the term "annoy" or "annoyance," which the Supreme Court has held to be inherently vague. *See Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) ("Conduct that annoys some people does not annoy others. Thus, the ordinance is vague * * * in the sense that no standard of conduct is specified * * * *").[19] In contrast to the standardless ordinances addressed in the public nuisance cases cited in the preceding paragraph, the ordinance at issue in the case at bar provides a straightforward standard which ordinary persons can understand and pursuant to which police officers are able to enforce the ordinance. Accordingly, we find no merit in defendant's contention that *Hendershot, Berker,* and *Jamgochian* are controlling with respect to his appeal.

In conclusion, it is our opinion that there is no basis for holding that § 16–93 of the Providence Code of Ordinances is void for vagueness. Accordingly, we affirm the hearing justice's ruling with respect to defendant's vagueness argument.

## D

### Overbreadth

■ The question of whether an ordinance is overbroad is separate and distinct from that of whether it is unconstitutionally vague. *Russell,* 890 A.2d at 459; *see also Village of Hoffman Estates,* 455 U.S. at 494–95, 102 S.Ct. 1186. A straightforward and precise ordinance "may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned,* 408 U.S. at 114, 92 S.Ct. 2294. The defendant argues that § 16–93 is overly broad on its face because it is neither reasonable in its limitations nor narrowly tailored to serve the city's stated purpose. Specifically, defendant contends that § 16–93 "captures within its sweep far too broad a swath of constitutionally protected expression" and, that, therefore, it is overbroad in violation of the First and Fourteenth Amendments. We disagree.

■ Pursuant to the overbreadth doctrine, a court must invalidate "laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Morales,* 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (internal quotation marks omitted); *see also United States v. Stevens,* —— U.S. ——, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435

---

*State v. Jamgochian,* 109 R.I. 17, 279 A.2d 923 (1971), "in substance," provided as follows:

> "[I]t [is] unlawful for any person to stand on any sidewalk so as to obstruct free passage for foot passengers; or for any person to hinder, delay, disturb or annoy passersby; or for any person obstructing a sidewalk to refuse to move immediately when

requested to do so by a police officer." *Id.,* at 20, 279 A.2d at 925.

19. *See also Nichols v. City of Gulfport,* 589 So.2d 1280, 1284 (Miss.1991) ("If beauty is in the eye of the beholder, whether a noise is 'unnecessary,' 'unusual' or 'annoying' certainly depends upon the ear of the listener.").

(2010); *URI Student Senate*, 631 F.3d at 12; *Russell*, 890 A.2d at 459. The overbreadth doctrine "generally applies in the context of First Amendment freedoms and is intended to prevent the imposition of criminal penalties for the exercise of one's constitutional rights." *Russell*, 890 A.2d at 459; *see also Massachusetts v. Oakes*, 491 U.S. 576, 581, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989) ("The doctrine is predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions."); *DiRaimo v. City of Providence*, 714 A.2d 554, 565 (R.I.1998). Significantly, it is axiomatic that "[t]he right to use a public place for expressive activity may be restricted only for weighty reasons." *Grayned*, 408 U.S. at 115, 92 S.Ct. 2294; *see* Section III C of this opinion, *supra.*

 It should be borne in mind, however, that "[t]he overbreadth doctrine is strong medicine that is used sparingly and only as a last resort." *New York State Club Association, Inc. v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (internal quotation marks omitted); *see also Frisby*, 487 U.S. at 491, 108 S.Ct. 2495; *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *URI Student Senate*, 631 F.3d at 12; *Russell*, 890 A.2d at 459. For that reason, it is important to remain mindful of the principle that "the overbreadth of a statute must not only be real, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908

(emphasis added); *see also New York State Club Association, Inc.*, 487 U.S. at 14, 108 S.Ct. 2225; *Taxpayers for Vincent*, 466 U.S. at 799, 104 S.Ct. 2118 ("In order to decide whether the overbreadth exception is applicable in a particular case, we have weighted the likelihood that the statute's very existence will inhibit free expression."). It follows that "the mere fact that one can conceive of *some impermissible applications* of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800, 104 S.Ct. 2118 (emphasis added); *see also New York v. Ferber*, 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

 In assessing defendant's overbreadth argument, we adhere to the principle that, although the government may place reasonable time, place, and manner restrictions on speech in a public forum, the enacted restrictions must: (1) be content neutral; (2) be narrowly tailored to serve a significant government interest; and (3) leave open alternative channels for communication of information. *See Ward*, 491 U.S. at 791, 109 S.Ct. 2746 (setting forth the "time, place, and manner" test); *Grayned*, 408 U.S. at 115–17, 92 S.Ct. 2294 (applying the "time, place, and manner" test to a facial overbreadth challenge); *see also Hill v. Colorado*, 530 U.S. 703, 731, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir.2011).[20]

### 1. Content Neutral

 When an ordinance "serves purposes unrelated to the content of ex-

---

**20.** "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). It will be recalled that, as we stated in Section III C of this opinion, *supra*, § 16–93 is violated when a person, in a residential area, uses a device which broadcasts sound that, under the circumstances, could not be tolerated by a reasonable person—*i.e.*, one who is "not excessive or extreme" (see footnote 17, *supra* ).

pression[, it] is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *see also Grayned,* 408 U.S. at 115, 92 S.Ct. 2294. A restriction is content neutral if it is "justified without reference to the content of the regulated speech." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (internal quotation marks omitted).

 The ordinance at issue in this case does not in any way make reference to the content of the sound; instead, it regulates only the *volume* of noise. *See DA Mortgage, Inc.,* 486 F.3d at 1266 (stating that the content-neutral noise ordinance at issue in that case "does not distinguish, for example, between excessively loud singing, thunderous classical music recordings, reverberating bass beats, or television broadcasts of raucous World Cup soccer finals. It simply prohibits excessively loud noise from recorded sources, whether radio, television, phonographs, etc."). Accordingly, the City of Providence, through § 16–93, is merely "turning down" the volume of noise emanating from the various devices in residential areas, rather than regulating the content of the speech. *See Grayned,* 408 U.S. at 116, 92 S.Ct. 2294 ("If overamplified loudspeakers assault the citizenry, government may turn them down.").

## 2. Significant Interest

 As we discussed in Section III C of this opinion, *supra,* the government has a "substantial interest in protecting [the] citizens from unwelcome noise[,] * * * [which] interest is perhaps at its greatest when government seeks to protect the well-being, tranquility, and privacy of the home." *Ward,* 491 U.S. at 796, 109 S.Ct. 2746 (citations and internal quotation marks omitted); *see also Taxpayers for Vincent,* 466 U.S. at 806, 104 S.Ct. 2118

("[M]unicipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *Gimmicks, Inc. v. Dettore,* 612 A.2d 655, 659 (R.I.1992) ("Noise can be a nuisance if it unreasonably interferes with a person's use and enjoyment of his property." (internal quotation marks omitted)). We therefore deem § 16–93 to be a content-neutral regulation that serves a significant governmental interest.

## 3. Narrowly Tailored

 An enactment is narrowly tailored so long as it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (internal quotation marks omitted). The enactment, however, "need not be the least restrictive or least intrusive means" of serving the government's content-neutral significant interests. *Id.* at 798, 109 S.Ct. 2746; *see also Hill,* 530 U.S. at 726 n. 32, 120 S.Ct. 2480. Rather, the enactment must "focus[ ] on the source of the evils the [governmental entity] seeks to eliminate—[viz.,] excessive and inadequate sound amplification—and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward,* 491 U.S. at 799 n. 7, 109 S.Ct. 2746 (stating that the just-quoted principle is "the essence of narrow tailoring"); *see also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 297, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ("None of [the regulation's] provisions appears unrelated to the ends that it was designed to serve.").

 In its regulation of the volume of "radios, television sets, and similar devices," § 16–93 delineates a specific standard tailored for that *particular* category of broadcast sound which is meant for

personal listening. *See DA Mortgage, Inc.,* 486 F.3d at 1267 ("The subsection that regulates noise from devices that reproduce sounds such as televisions, radios, phonographs and musical instruments contains a standard that is specifically tailored to that particular category of sound"). Indeed, chapter 16, Article III of the Providence Code of Ordinances regulates a variety of sounds, through a variety of standards. *See, e.g.,* § 16–95 of the Providence Code of Ordinances (regulating drums); § 16–96 (regulating sounds near "[s]chools, hospitals and churches"); § 16–97 (regulating "machinery, equipment, pump, fan and air conditioning apparatus"); § 16–105 (regulating the commercial and noncommercial use of sound amplifying equipment). Given the limited reach of § 16–93 and the regulation of other sounds through other sections of the municipal code, it is to be expected that § 16–93 would not interfere with other forms of communication that are meant to have a wider expressive message.

Additionally, through its reasonableness standard (*see* Section III C, *supra* ), § 16–93 ensures that the willing listener is not prohibited from listening to his or her device at a fair volume, while it nevertheless provides for the welfare of the "unwilling" listener. *See Kovacs,* 336 U.S. at 86–87, 69 S.Ct. 448. It is clear to us that that standard of reasonableness puts beyond the pale the broad and unreasonable interpretations which defendant hypothesizes in his brief to this Court (*e.g.,* would the statute be violated "by [a person] listening to an iPod at normal volumes" or by "[p]laying a car radio that is barely audible at 200 feet in the daytime, in the middle of a parade").

The *prima facie* evidence itemized within § 16–93 (*see* Section III C of this opinion, *supra* ) also provides a standard of enforcement so that it is expected that those willingly listening to the listed devices would not be affected. Significantly, the *prima facie* evidence also takes into account the time of the violation, which demonstrates the city's tailoring of the ordinance (to relate to the time of day) in order to promote the welfare of the citizenry.[21]

In light of the foregoing analysis, we are of the opinion that § 16–93 is sufficiently narrowly tailored to pass muster pursuant to the pertinent constitutional principles.

### 4. Alternative Channels of Communication

We need not elaborate on the final requirement for a valid time, place, and manner restriction—*viz.,* that the enactment "leave open ample alternative channels of communication." *Ward,* 491 U.S. at 802, 109 S.Ct. 2746. Section 16–93 merely regulates the *volume of sound* from devices such as televisions and radi-

---

21. The defendant relies on *Duffy v. City of Mobile,* 709 So.2d 77 (Ala.Crim.App.1997) and *Lilly v. City of Salida,* 192 F.Supp.2d 1191 (D.Colo.2002), in his effort to persuade this Court that § 16–93 is unconstitutionally overbroad. In our view, however, those cases, are readily distinguishable from the instant case.

In *Duffy,* 709 So.2d at 81, the court held to be invalid an ordinance that constituted "an absolute prohibition of any amplified sound that is plainly audible at greater than fifty feet, *anywhere* in the City and *at any time* of day or night." (Emphasis added.) That invalidated ordinance did not significantly limit its reach, whereas § 16–93 extends to only residential areas and tailors its standard based on the time of day. *See Duffy,* 709 So.2d at 81.

Similarly, the ordinance held to be unconstitutional by a federal district court in *Lilly* was significantly broader than the ordinance at issue in this case in view of the fact that it placed no limits on the time or place of the prohibited activity. *See Lilly,* 192 F.Supp.2d at 1192.

os. As the United States Supreme Court has stated, "[t]hat the city's limitations on volume may reduce to some degree the potential audience for * * * speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." *Ward,* 491 U.S. at 802, 109 S.Ct. 2746; *see also Taxpayers for Vincent,* 466 U.S. at 803, 104 S.Ct. 2118.

Accordingly, we conclude that § 16–93 of the Code of Ordinances of the City of Providence is narrowly tailored to serve the substantial and content-neutral governmental interest of maintaining the health and welfare of its citizens in residential areas, and the ordinance leaves open ample alternative channels of communication. As a result, the impermissible applications of the law are not substantial when judged in relation to the ordinance's plainly legitimate sweep; § 16–93 is, therefore, not overbroad.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.