**FLEET NATIONAL BANK, Trustee**

v.

**175 POST ROAD, LLC.**

No. 2002–182–Appeal.

Supreme Court of Rhode Island.

June 21, 2004.

Thomas S. Hemmendinger (Receiver), for Plaintiff.

Armando O. Monaco, II, East Greenwich, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

SUTTELL, Justice.

Is it an instance of a mutual mistake between two sophisticated parties to a real estate contract when one of the parties realizes that it misunderstood the terms of the bargain despite having two opportunities to clarify any misunderstandings in the written contract? In this appeal from a Superior Court judgment in response to a petition for instructions by a receiver regarding the rights and obligations of parties to a purchase and sale agreement, we conclude that the misunderstanding was the result of neither mutual mistake nor misrepresentation. Accordingly, we affirm the judgment.

### Facts and Travel

Fleet National Bank (Fleet) was the original mortgagee of commercial real estate at 175 Post Road in Warwick, Rhode Island (the property). In 1995, Fleet filed a petition for the appointment of a receiver of the property's owner, 175 Post Road, LLC (175 Post Road) to aid in the foreclosure of its mortgage. As a result of that proceeding, 175 Post Road became a debtor in a receivership, and Thomas S. Hemmendinger was appointed as the receiver (the receiver) with authority to "take possession and charge of the estate, assets, effects, property and business of the Defendant [175 Post Road] * * * and to preserve the same." The same order authorized the receiver to "sell, transfer and convey his right, title and interest * * * to any real property * * * for such sum or sums of money as to him appears reasonable * * *."[1]

In 1996, Fleet assigned its mortgage on the property to Neles–Jamesbury, Inc.

---

1. Since his appointment, the receiver has maintained the property using money provided by Fleet and, subsequently, by Neles–Jamesbury, Fleet's successor-in-interest to the property.

(Neles–Jamesbury). Subsequently, the receiver and counsel for Neles–Jamesbury initiated discussions with the Department of Environmental Management (DEM) concerning the assessment and remediation of environmental hazards on the property, a vacant manufacturing facility in the Pawtuxet Industrial Park. At the time, the receiver and Neles–Jamesbury expected that the discussions eventually would result in a settlement agreement concerning the environmental remediation and a mutual covenant not to sue over any claim arising from existing contamination on the property.

The receiver solicited offers for the property. On or about March 10, 1998, Brian Bowes (Bowes), who later would become the principal of AZA Realty Trust (AZA), made an offer to the receiver to purchase the property. Bowes's initial offer was subject to certain conditions, including the following:

> "(C) The Receiver agrees to perform asbestos removal from floor tiles and building pipe heating system to the extent required by applicable regulations as determined by a qualified asbestos contractor."

Much of the initial offer reveals concerns about the property's environmental condition. For instance, paragraph 2 sets a 120–day window for the receiver and Neles–Jamesbury to deliver marketable title to the purchaser "provided that DEM and Neles–Jamesbury, Inc. reach final agreement on the remedy and remedial objectives to be employed in the remediation of the Property."

The initial offer also explicitly indicated that the purchaser would take the property "AS IS" and without warranties:

> "Purchaser agrees to accept the Property in 'AS IS' condition, including the condition of the windows, roof, boiler, structure and presence and condition of any underground storage tanks. Purchaser is not relying upon any warranty, statement or representation, express or implied, made by or on behalf of Receiver as to any matter whatsoever with respect to the Property * * *."

The offer sheet also included the receiver's signature as evidence of his acceptance of Bowes's offer and deposit of $55,000. AZA was incorporated shortly thereafter and was designated by Bowes as his nominee under the terms of the offer.

The Superior Court authorized the receiver to negotiate and enter into a purchase and sale agreement with Neles–Jamesbury and Bowes "with such terms and conditions as the Receiver may deem advisable and beneficial to the receivership estate, subject to court approval." The order specified that the receiver was authorized to sell the property "on the terms and conditions set forth in the Offer, as more fully set forth in the purchase and sale agreement * * *." Furthermore, the Superior Court authorized the receiver to enter into a settlement agreement with Neles–Jamesbury, Bowes, and DEM pursuant to Rhode Island's Industrial Property Remediation and Reuse Act, G.L. 1956 chapter 19.14 of title 23.

Shortly thereafter, on April 24, 1998, the receiver sent buyer's counsel a letter that included a draft of the purchase and sale agreement for comments. Within a week, buyer's counsel sent a response letter indicating that he had reviewed the agreement, and had comments on some of its provisions. Counsel's letter included comments and suggestions concerning paragraph 5.2(a) dealing with damage to the property, paragraph 10.8 dealing with entry onto the property, and paragraph 10.13 dealing with buyer's obligation to pay the "deed stamps." Counsel's letter also asked about the scheduling of meetings

with DEM "so that we can conclude this transaction as soon as possible."

The purchase and sale agreement was executed on May 28, 1998. It specifies the parties to the transaction, sets the purchase price at $550,000, and notes that the deposit of $55,000 already had been delivered to the escrow agent. Under "Seller's Representations and Warranties," Neles–Jamesbury represented that it "has made available to Buyer all reports, assessments and studies within Seller's possession and control which relate to the environmental condition of the Property and Buyer hereby acknowledges receipt of them." Moreover, under the "Buyer's Representations and Warranties," the agreement further specified that AZA inspected the property for itself:

"4.1 *Disclaimers.* Buyer is not relying upon any written or oral warranty, statement or representation, express or implied, made by or on behalf of Seller or Neles–Jamesbury or 175 Post Road, LLC, or its members as to any matter whatsoever with respect to the Property, including value, zoning matters, the structural, environmental or other condition of the Property * * *. Buyer has made its own structural, termite and other inspections which Buyer deems appropriate prior to execution of this Offer. Buyer agrees that it has had full and adequate opportunity to inspect the Property, and agrees that conveyance thereof shall be accepted 'AS IS,' 'WHERE IS,' and 'WITH ALL FAULTS.'"

As is evident, AZA disclaimed any reliance on warranties written or *oral* by Neles–Jamesbury and the seller concerning the environmental condition of the property.

The agreement also included a specific provision for asbestos abatement:

"10.2 *Asbestos.* Seller agrees to remove asbestos from certain floor tiles on the first floor of the former office areas and on the second floor mezzanine and from certain heating system pipes in the Boiler Room in the Building to the extent required by applicable regulations as determined by a qualified asbestos contractor to be engaged by Seller and paid by Neles–Jamesbury."

Furthermore, the agreement included a global integration clause that provided as follows:

"10.10 *Entire Agreement.* This Agreement and the documents referred to herein contain the entire agreement between the parties with respect to the transactions contemplated hereby, and no modification hereof shall be effective unless in writing and signed by the party against which it is sought to be enforced."

After the purchase and sale agreement was executed, the receiver petitioned the Superior Court to approve it. The receiver represented that the approval of the agreement was "in the best interests of the receivership estate and its creditors * * *." The Superior Court granted the petition authorizing the receiver to carry out the terms of the agreement. The parties later executed an extension agreement in which they extended the closing date for the sale to September 15, 1998, to obtain a settlement agreement from DEM. The extension agreement also provided that, "Except as specifically modified herein, the Agreement remains in full force and effect."

On September 15, 1998, the parties executed an "Amendment" to the purchase and sale agreement (amendment) that altered a few key provisions, including an increase in the purchase price from $550,000 to $635,000. The amendment also modified the asbestos abatement provision to read as follows:

"10.2 *Asbestos.* Seller agrees to remove and dispose asbestos containing material from certain floor tiles on the first floor of the former office areas and on the second floor mezzanine, comprising up to 22,965 square feet, and from certain heating system pipes in the Boiler Room, comprising up to 1,202 linear feet in the Building to the extent required by applicable regulations as determined by a qualified asbestos contractor to be engaged by Seller and paid by Neles–Jamesbury. Seller further agrees to remove and dispose 275 linear feet of ACM from pipe on the second floor mezzanine and 875 linear feet of ACM from pipe in the first floor office areas. Neles–Jamesbury agrees to provide the required verifications. This paragraph contains all of Neles–Jamesbury's and the Seller's asbestos abatement obligations." [2]

As is evident from comparing the two asbestos provisions, the amended provision differed from the original agreement in that it described the areas to be abated in square and linear feet, and provided that the seller was to remove and dispose of up to 22,965 square feet of asbestos-containing material from floor tiles and up to 2,352 linear feet from pipes. These figures were consistent with a project scope and pricing proposal dated August 26, 1998, performed by Fleet Environmental Services, LLC (Fleet Environmental) at the behest of the sellers. In addition, the amended provision added that the terms of the paragraph satisfied the abatement obligations of Neles–Jamesbury and 175 Post Road. The amendment also contained an integration clause stating, "[t]he Agreement, as modified by this Amendment, contains the entire agreement between the parties with respect to the transactions contemplated hereby * * *." The amendment to the purchase and sale agreement was duly executed by all the parties.

The receiver then petitioned the Superior Court to approve the amendment and a Brownsfields Settlement Agreement to remediate environmental problems on the property. The Superior Court approved both documents on January 12, 1999. The receiver, Neles–Jamesbury, and AZA entered into a settlement agreement and covenant not to sue with DEM later that month. The receiver conveyed the deed to the property to AZA on January 19, 1999, after which AZA granted Neles–Jamesbury an easement to the property so that it could engage in the "environmental response actions required pursuant to the terms of the [Brownsfields] Settlement Agreement."

The issues in the present controversy began to take shape when, in a letter on February 15, 1999, counsel for AZA first objected to the scope of the asbestos abatement work. In that letter, counsel for AZA said that "[i]t is my recollection that in our conversation about the asbestos removal, that it was to include all asbestos removal, except that which was not exposed." On the heels of this letter, AZA requested and received [3] an estimate of the cost of removing all exposed asbestos in the building from Fleet Environmental. In a letter of May 28, 1999, Fleet Environmental said that it made inspections of "all *additional* areas to be abated." In the "Project Scope," Fleet Environmental explained that expanded abatement would require modifying the existing DEM approved abatement plan. Also included in the "Project Scope" were provisions describing the tasks to be done in abating "all remaining accessible ACBM located

**2.** ACM is an acronym for asbestos-containing material.

**3.** All the parties received this letter.

throughout the interior of the existing building."[4] The total price for the adjusted cleanup came to $59,870.

Shortly thereafter, Fleet Environmental informed the receiver that AZA was refusing to sign certain Rhode Island Department of Health forms that the abatement contractor had to submit to regulators because it disputed the scope of the abatement work. Without these signed forms, the abatement work could not begin. The receiver then became concerned that the dispute over the asbestos abatement might affect the rights and obligations of the parties under the Brownfields Settlement Agreement because that agreement established certain deadlines for completing the assessment and remediation. As a result of this concern, the receiver petitioned the Superior Court for an order declaring the respective rights and obligations of the parties with respect to asbestos abatement and the Brownfields' environmental assessment and remediation.

In response to the receiver's petition, AZA filed a memorandum of law arguing that the purchase and sale agreement, as amended, must be reformed because of mutual mistake of fact or misrepresentation by Neles–Jamesbury. AZA maintained that the agreement did not adequately reflect the amount of exposed asbestos in the building. AZA requested an evidentiary hearing "to determine whether * * * Fleet Environmental had performed any inspection services to determine the full scope of asbestos in the building." AZA argued that:

"[i]f, in fact, no quantified numbers were available prior to May 28, 1998, and no inspection of the building had been performed by the receiver and/or Neles–Jamesbury * * * then it is clear that there was a mutual mistake of fact between AZA Realty Trust, Inc. and Neles–Jamesbury as to the asbestos abatement."

AZA further argued that if Fleet Environmental had done an asbestos analysis of the entire building, but limited the scope of work only to certain areas, "then there may be a fraudulent misrepresentation as to the asbestos abatement * * *."

The receiver and Neles–Jamesbury responded with memoranda denying AZA's arguments that there was a mutual mistake between the parties about a material term of the contract or that there was a fraudulent misrepresentation. On October 5, 2001, after conducting several hearings, the hearing justice issued a bench decision, and on October 23, 2001, an order was entered in which the Superior Court found that "the respective rights and obligations of the [parties] with respect to asbestos abatement at the real estate * * * are only those rights and obligations set forth in Section 10.2 of the Purchase and Sale Agreement among the [parties], as amended * * *." The hearing justice also denied AZA's claims based on fraud, misrepresentation, mutual mistake, rescission, and reformation. From this order, AZA appealed.

## Discussion

On appeal, AZA argues that the purchase and sale agreement, as amended, must be reformed because the conditional language in the offer and section 10.2 of the amendment do not conform. AZA further argues that "[i]t is clear and convincing that the documentation supplied clearly shows that both parties relied on the numbers from Fleet Environmental and in fact, these numbers did not represent the scope of asbestos removal as agreed to by the parties." AZA seeks relief in which

4. ACBM is used as an abbreviation for asbestos-containing building materials.

the agreement is rewritten to reflect the actual asbestos that needs to be removed.[5]

■ Our standard of review of a Superior Court justice's declaratory judgment is one of great deference. "In issuing a declaratory judgment, a trial judge makes all findings of fact without a jury. It is well-established that 'the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong.'" *Casco Indemnity Co. v. O'Connor*, 755 A.2d 779, 782 (R.I.2000) (quoting *Technology Investors v. Town of Westerly*, 689 A.2d 1060, 1062 (R.I.1997)). "Further, the 'resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence, are entitled to the same deference.'" *Id.* (quoting *Wickes Asset Management, Inc. v. Dupuis*, 679 A.2d 314, 317 (R.I.1996)). A trial justice's findings on questions of law, however, are reviewed *de novo*. *Id.*

■ After reviewing the record and submissions of the parties, we discern little merit in AZA's position. As AZA makes clear in its brief, both parties relied on Fleet Environmental's initial report in determining the scope of asbestos removal from the property. That the conditional language of the offer and the purchase and sale agreement differ in material respects is unavailing to AZA. The offer became obsolete when the parties executed the agreement. *See* 17A Am. Jur. 2d *Contracts* § 86 at 108 (1991) ("The effect of an acceptance containing conditions not found in the offer is to make a counterproposal * * *. Where an offeror acts upon the counterproposal, a contract will arise based upon the terms of such counterproposal.").

The "Disclaimers" section of the purchase and sale agreement, section 4.1, specifically disclaims any representations or warranties about the environmental condition of the property. The same section makes it incumbent on the buyer to perform any inspections on the property, and sets forth the buyer's agreement that it has had "full and adequate opportunity to inspect the Property" and would accept conveyance "AS IS." Also, section 10.2 of the agreement indicates the locations where Neles–Jamesbury agreed to pay for asbestos removal. AZA cannot now allege that it was unclear about which areas were to be abated by Neles–Jamesbury, or that it was misled about the condition of the property when it was placed on notice to inspect the property itself before buying it. Instead, AZA relied on the inspection that Fleet Environmental did for the sellers. If AZA had intended that all asbestos on the property was to be abated at Neles–Jamesbury's expense, it could have conducted an independent inspection to determine the extent of asbestos on the property, and then could have attempted to negotiate a provision that required Neles–Jamesbury to abate *all* asbestos on the property. AZA did neither of these things.

Furthermore, if AZA had any concerns related to the extent of asbestos abatement after it executed the original purchase and sale agreement, the amendment clearly put it on notice that the terms of the amended agreement were final. This latter agreement amended section 10.2 to describe the area that Neles–Jamesbury was responsible to remediate in square

---

**5.** AZA arguably waived any recourse to such relief when it endorsed section 1.3 of the purchase and sale agreement that provided that "Buyer hereby waives any right to rescind or reform this Agreement before and after performance hereunder."

and linear feet with the notable addition that the paragraph contained "all of Neles–Jamesbury's and the Seller's asbestos abatement obligations." These words are unambiguous; they manifest an intent that the terms of section 10.2 contain *all* of Neles–Jamesbury's and 175 Post Road's responsibilities with respect to asbestos abatement. AZA maintains that "the quantities [of asbestos] identified in the Purchase & Sales Agreement were based on the document presented to them by Neles–Jamesbury and the Receiver in identifying the quantity of asbestos." However, such reliance was in derogation of the express terms of the contract. Any confusion that AZA may have experienced with regard to these terms was belied by its execution of the amendment. *See* 17A Am. Jur. 2d *Contracts* § 28 at 56 (1991) ("Assent in the sense of the law is a matter of overt acts and expressions, not of inward unanimity in motives, design, or the interpretation of words."). AZA's exclusive reliance on the initial Fleet Environmental report was misplaced and clearly and convincingly cannot serve as a ground for reformation. *See Hopkins v. Equitable Life Assurance Society of the United States*, 107 R.I. 679, 685, 270 A.2d 915, 918 (1970) (no reformation unless variance between writing and original intention of parties as well as mutual mistake demonstrated by clear and convincing evidence).

What AZA complains of is not a mutual mistake, but a unilateral mistake based upon its own lack of knowledge of the condition of the property. AZA's argument that the contract terms are the result of a mutual mistake is based on its claim that it is clear and convincing that each party relied on Fleet Environmental's initial representation of the quantity of asbestos to be removed. AZA argues that when the scope of abatement changed as a result of a change in terms from the offer to the purchase and sale agreement, the mutual mistake occurred. This argument, however, miscasts the substance of a mutual mistake.

"A mutual mistake is one common to both parties where each labors under a misconception respecting the same terms of the written agreement sought to be corrected." *Vanderford v. Kettelle*, 75 R.I. 130, 142, 64 A.2d 483, 488 (1949). We first observe that Neles–Jamesbury is not saying that it was mistaken about the scope of asbestos abatement. Neles–Jamesbury asserts that section 10.2 of the initial and amended agreements reflected bargained-for and court-approved contract terms concerning the scope of abatement.

Nor does AZA argue that Fleet Environmental's initial assessment was erroneous; rather AZA asserts that the assessment should have covered areas in addition to those described. AZA's argument misses the point. The mistake alleged must be *mutual. See Hopkins*, 107 R.I. at 685, 270 A.2d at 918. In this case, Neles–Jamesbury did not bargain to limit the scope of asbestos abatement to certain areas by accident. It did not stumble into potentially favorable contract provisions by accident and then make *post hoc* legal claims to protect its windfall. All the negotiations about asbestos were overt, as were all disclaimers and warranties about the environmental condition of the property. Moreover, AZA was represented by counsel throughout the negotiations. "A mistake by one party coupled with ignorance thereof by the other party does not constitute a mistake within this rule." *Vanderford*, 75 R.I. at 142, 64 A.2d at 489.

Here, AZA took the risk of relying on its limited information of the environmental condition of the property instead of conducting an independent review as provided, and, arguably, recommended by the

language of the purchase and sale agreement.

■ Furthermore, AZA asserts that if the receiver and Neles–Jamesbury knew that the property contained asbestos beyond those areas identified in the initial Fleet Environmental report, then the receiver and Neles–Jamesbury made a misrepresentation about the scope of asbestos abatement. We are unconvinced by this argument and see no ground upon which AZA's claim can find a foothold. In this case, the contract was clear and unambiguous. In such a situation we must give its language its plain, ordinary, and usual meaning. *See Rubery v. Downing Corp.*, 760 A.2d 945, 947 (R.I.2000) (per curiam). Since the terms of these contracts were clear and unambiguous, "the task of judicial construction is at an end and the agreement[s] must be applied as written." *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I.1994) (citing *Aetna Casualty & Surety Co. v. Graziano*, 587 A.2d 916, 917 (R.I.1991)).

Neither the original purchase and sale agreement nor the amendment is amenable to more than one interpretation. *See W.P. Associates*, 637 A.2d at 356. AZA's assertion that the receiver and Neles–Jamesbury misrepresented the scope of asbestos abatement is refuted by the earlier cited provision, section 4.1, that disclaimed AZA's reliance on any of the receiver's or Neles–Jamesbury's representations. AZA also concedes that "the prior environmental studies indicate that other areas of the building have asbestos in them." Furthermore, AZA possessed the same information about the property's environmental condition as the receiver and Neles–Jamesbury. Section 2.2 of the original agreement represented that "Seller has made available to Buyer all reports, assessments, and studies within Seller's possession and control

which relate to the environmental condition of the Property and Buyer hereby acknowledges receipt of them."

■ At the hearing on October 5, 2001, the hearing justice noted that both the original agreement and amendment were approved by the Superior Court, and said:

> "recognizing the 'as is' language contained; and recognizing that substantial environmental information was turned over to the buyer and that the buyer undertook and represented that it, in fact, was not relying on anything, essentially, other than its own analysis and review; this Court cannot do anything other than instruct the Receiver here that the language of * * * 10.2 * * * constitutes the obligations of the parties."

We agree and also observe the well-accepted rule "that a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." *Kottis v. Cerilli*, 612 A.2d 661, 668 (R.I.1992) (quoting *F.D. McKendall Lumber Co. v. Kalian*, 425 A.2d 515, 518 (R.I.1981)). We discern no misrepresentation.

■ Having disposed of AZA's argument for reformation based on a mutual mistake or misrepresentation, it follows that its request for an evidentiary hearing must be denied. Contrary to AZA's contention that the Superior Court "should * * * have permitted the evidence of prior contemporaneous oral statements to aid in the understanding of the agreement," these contracts admit of no ambiguity that would require extrinsic evidence to better understand them. We previously have held "[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts

or aids." *Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill,* 652 A.2d 440, 443 (R.I.1994) (citing *Greenwald v. Selya & Iannuccillo, Inc.,* 491 A.2d 988, 989 (R.I. 1985)). In addition, the parol evidence rule bars the admission of any previous or contemporaneous oral statements that attempt to modify an integrated written agreement. *Riley v. St. Germain,* 723 A.2d 1120, 1122 (R.I.1999) (per curiam). In this case, we need not go beyond the unambiguous terms of the agreements in order to understand them.

## Conclusion

For the foregoing reasons we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.