Beverly HAVILAND

v.

**Ruth J. SIMMONS in her capacity as President of Brown University et al.**

No. 2010–231–Appeal.

Supreme Court of Rhode Island.

July 6, 2012.

Thomas M. Dickinson, Esq., Woonsocket, for Plaintiff.

John A. MacFadyen, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on February 8, 2012, on appeal by the defendant, Brown University (defendant, Brown, or the University), from a Superior Court judgment in favor of the plaintiff, Beverly Haviland (plaintiff or Haviland), in her action for declaratory relief. The defendant contends that there exists no justiciable issue in this case because the plaintiff could not demonstrate an injury in fact, as she does not face any actual or imminent loss of employment. The defendant also asserts that the trial justice erred in determining the existence of an implied-in-fact contract between the plaintiff and Brown because insufficient evidence was presented to establish an enforceable promise of *de facto* tenure. The defendant further contends that no tenure-like standard of review applies to the plaintiff because only the Brown Corporation was vested with the authority to grant tenure and none of the University administrators who communicated with Haviland were vested with actual or apparent authority to provide the plaintiff with *de facto* tenure. For the reasons set forth herein, we affirm the judgment of the Superior Court.

### Facts and Travel

Aristotle once said that love is composed of a single soul inhabiting two bodies, and herein lies a significant problem for recruitment and contractual relations in the venerable halls of academia. Many colleges and universities are confronted with what can be characterized as the "two-body problem"—a situation where two academics both seek employment in a certain geographical area so that they may live together. Such a situation creates a predicament where an institution that is seeking to recruit one spouse must fashion a

second, concomitant position for the accompanying academic spouse. Although the recruitment of dual-career couples is increasingly prevalent in higher education, few universities have implemented formal policies or regulations to govern the recruitment and hiring process—often resulting in unique arrangements, unclear promises, unforeseen changes, and uncertainty for the professors and the recruiting university.[1] We are faced with such a confusing situation in the case before us.

In the spring of 2000, plaintiff's husband, Paul Armstrong (Armstrong), was nominated for the position of Dean of the College at Brown.[2] After submitting his application and undergoing the interview process, Armstrong was offered the position of dean. There were several conditions that Armstrong attached to his acceptance, however, including that he "would not be able to accept the position of Dean of the College at Brown unless an appropriate position could be found for [his] spouse." At the time, Armstrong was serving as Dean of the Faculty of Arts and Sciences and as an English professor at the State University of New York at Stony Brook (SUNY–Stony Brook) in Long Island. The plaintiff was a tenured associate professor of comparative studies at SUNY–Stony Brook. She previously had served as a tenured associate professor at Vassar College, where she had been for ten years. Discussions began between Brown's Provost, Katherine Spoehr (Provost Spoehr), and Armstrong as to which academic departments would be suitable for Haviland and what could be done to find a position for her.

In September 2000, Armstrong learned in a phone call from Provost Spoehr "that it was not going to be possible to craft a tenured position for [Haviland]." Armstrong responded that if tenure were not an option for his wife, he would be unable to accept the position with the University. At trial, Armstrong testified that Provost Spoehr responded to this comment by saying, "don't rush, don't be hasty, let's see whether we can work something out." Armstrong also testified that he and Haviland next received a telephone call from Brown's Interim President, Sheila Blumstein (President Blumstein), who similarly stated, "don't be hasty, let's try to think outside the box." President Blumstein asked the couple to think about what it would take for them to come to Brown. According to Armstrong, Haviland expressed to President Blumstein that her primary concern, should the family change jobs, was employment security because, at the time, the couple had an eighteen-month-old son. The couple listed the following requirements as necessary criteria for them to come to Brown: (1) that Haviland receive faculty benefits equivalent to those of the regular faculty; (2) recognition of the fact that Haviland had earned the rank of an associate professor and had published various books and articles; and (3) employment security equivalent to tenure. They wanted to ensure that she would receive the same assurances of employment that tenured faculty receive. After these conversations with President Blum-

---

**1.** A Stanford University study conducted in 2008 indicated that academic couple hiring has increased from 3 percent in the 1970s to 13 percent since 2000 and that the process of hiring couples at colleges and universities tends to be *ad hoc*, shrouded in secrecy, uncertain, and inconsistent. Londa Schiebinger et al., Michelle R. Clayman Institute for Gender Research, *Dual–Career Academic Couples: What Universities Need to Know* 1–2 (Stanford University 2008).

**2.** We glean the facts and travel from the record before us and the testimony adduced at trial.

stein, Provost Spoehr informed the couple that "they were going to try to work some things out" and that "this would take some time, that things did not move quickly [at Brown], that [they] should be patient, but [they] should not walk away, [they] should not think that things were over if [they] haven't heard."

Thereafter, a series of communications from Brown's administration to Armstrong and plaintiff, concerning plaintiff's possible employment with the University, ensued. The first was a fax transmission, dated October 16, 2000, sent from the Office of the Provost, that included a cover letter, a pre-hire letter, and a draft "ancillary letter outlining the process and standards for renewal of [Haviland]'s contract." The pre-hire letter stated that Haviland's position would be as a "Visiting Associate Professor/Senior Lecturer in the Department of Comparative Literature and American Civilization." The letter also set forth that the position was not a tenure-track appointment, but that plaintiff would receive a renewable contract with a five-year term, and that requirements for reappointment, as outlined in the Promotion Guidelines, were attached to the letter. The draft ancillary letter contained the following language:

> "Your appointment shall be renewed for additional five year terms unless the University presents to you in writing adequate cause for non-renewal of your appointment and after you have been afforded the rights of due process as prescribed in Section 10.I.A of The Faculty Rules and Regulations. Adequate cause for non-renewal of your contract shall be understood to be substantially

equivalent to adequate cause for dismissal of a tenured faculty member from the University, which is defined by The Faculty Rules and Regulations as the following: demonstrated incompetence, dishonesty in teaching or research, substantial and manifest neglect of duty, or personal conduct which substantially impairs fulfillment of institutional responsibility."

Armstrong testified that this communication satisfied two of plaintiff's requirements because the Senior Lecturer position provided regular medical, retirement, and sabbatical benefits, and the Visiting Associate Professor position recognized Haviland's standing and rank in the profession. The couple understood the draft ancillary letter as satisfying the third requirement of job security because, although "this is not a tenure-track appointment," it "provided the security of employment equivalent to tenure by stipulating what the criteria for nonrenewal would be, that [Haviland] would only be dismissed, her contract would not be renewed if the language [regarding nonrenewal for cause] were followed." Armstrong stated that he and Haviland agreed that these two documents together satisfied their requirements for an employment agreement.[3]

On October 18, 2000, plaintiff and Armstrong received another fax from the Provost's office and another draft letter for plaintiff, setting forth nearly identical provisions as the October 16 ancillary draft letter, but with the addition of website addresses for the Faculty Rules and Regulations and for the Handbook for Academic Administration.[4] A final letter stipulating

---

**3.** Although Armstrong and Haviland understood that the October 16 letter was in draft form, Armstrong called Provost Spoehr and informed her that if University counsel ap-

proved that version as the offer, he would accept the deanship.

**4.** The accompanying cover letter stated: "Here are the drafts of the two letters that

Armstrong's salary and position also was attached. They next received a letter by mail, dated October 18, 2000, that was signed by Dean Mary Fennell (Dean Fennell) and included all the provisions of the October 18 faxed draft letter, but the word "draft" was removed. After reviewing the mailed version of the October 18 letter, Armstrong called Provost Spoehr to accept the offer. Armstrong announced to his department at SUNY–Stony Brook that he would be resigning his position as Dean of Arts and Sciences and that he and Haviland both had accepted positions at Brown. The couple also took steps to put their house on the market, and they contacted a real estate agent and arranged to begin looking at homes in Rhode Island.

While in Providence, searching for suitable housing, Armstrong and Haviland received a letter from Dean Fennell, dated November 6, 2000.[5] This letter contained new language that caused them concern. In it, Dean Fennell indicated that plaintiff's reappointment would be reviewed according to the standard practices of reviewing a senior lecturer, including provisions for annual reviews of non-tenured faculty, and she stated that "[y]our appointment shall be governed by the regulations pertaining to non-tenured faculty appointments." Armstrong and Haviland were unnerved by the statement from Dean Fennell that "[t]his supersedes my letter to you of October 18, 2000." Armstrong testified that he "understood that to mean that Brown was reneging on the promise that had been crucial for me to accept its offer." Armstrong called Dean Fennell to inquire whether that sentence meant that the October 18 letter was null and void, and she assured him it did not mean that; she added that she "didn't intend to withdraw the promise of October 18." Dean Fennell agreed to put her understanding of the several letters into writing.

The plaintiff received the first formal offer letter on November 8, 2000, but she did not sign it until she received written assurance from Dean Fennell explaining how the October 18 and November 6 letters related to each other, as well as further assurance that the October 18 letter had not been supplanted. Dean Fennell wrote to Haviland on November 17, 2000, and stated that "use of the term 'supersedes' was unfortunate, as I did not mean to indicate that the October 18 letter was null and void; only that the more recent letter provides needed additional detail." The November 17 letter also noted that "a visiting appointment is not usually renewable beyond the initial term. Nonetheless, 'exceptions in extraordinary circumstances can be made in accordance with faculty appointment policies.' I would expect the university to consider your situation as one of those exceptions. * * * I believe the renewal of your appointment is assured." Armstrong testified that the language in the November 17 letter, noting that "requirements for reappointment and promotion are outlined in the Promotion Guidelines for each of your departments," led him to believe that the guidelines for reappointment applied "[e]xcept for the conditions in the October 18th letter, which [he] took to be affirmed by the first paragraph, which says that they are not null

---

were reviewed internally by our General Counsel's office. Please note that there are some minor language changes in [Armstrong]'s letter as per that office's recommendation."

5. The November 6, 2000 letter was delivered to the Office of the Dean at Brown where Armstrong had already begun receiving mail, which his soon-to-be assistant was collecting for him.

and void." [6]  Based on Haviland's understanding that Brown was still providing tenure-like security for her position, and that any dismissal would be only for cause, Haviland signed the November 8 letter, accepting the position.

The Advisory and Executive Committee at Brown convened on December 8, 2000 and approved Haviland's appointment as Visiting Associate Professor in Comparative Literature and American Civilization effective January 1, 2001, to January 31, 2005, and it approved her appointment as Senior Lecturer in Comparative Literature and American Civilization.  Armstrong and Haviland began serving in their respective capacities at Brown in January 2001.

When plaintiff's Senior Lecturer appointment came up for renewal review in her department in the fall of 2004, she received positive reviews from her departments, leaving Haviland and Armstrong confident she would be approved and reappointed by the Tenure Promotions and Appointments Committee (TPAC).  However, in a fickle twist of fate, the TPAC voted four to three against the renewal of Haviland's contract.  When reviewing Haviland for reappointment, the TPAC employed the standard from the American Civilization Departmental Guidelines— "[s]ustained excellence in teaching as evidenced in teaching evaluations collected over the three years previous to application for promotion."

The Provost at the time, Robert J. Zimmer (Provost Zimmer), rejected the TPAC's recommendation that Haviland's

contract not be renewed, and he decided to renew the contract for two-and-one-half years, while requiring that she come up for review again and "demonstrate in the interim that she had achieved the standard of sustained excellence in teaching"—a more challenging standard to satisfy than dismissal for cause.  Armstrong testified that he believed Provost Zimmer's solution was in contravention of the terms of the agreements that Haviland and he had reached with Brown with respect to providing Haviland with employment security.  Armstrong's understanding was that "whatever standard would be applied to reviewing [Haviland], she would ultimately be renewed unless written evidence would be provided, according to the letter of October 18th, 2000." [7]  In light of their understanding concerning the standards to be applied to Haviland's reappointment, Haviland filed an appeal of Provost Zimmer's decision with then-President Ruth Simmons (President Simmons).  The appeal was denied.

The plaintiff filed an action for declaratory relief on August 18, 2005.  Haviland's three-count complaint alleged: (1) a breach of an employment agreement between Haviland and Brown University; (2) promissory estoppel; and (3) that a declaratory judgment should be issued under the Uniform Declaratory Judgments Act (UDJA), G.L.1956 chapter 30 of title 9. As to the request for declaratory relief, defendant moved for dismissal as a matter of law because, defendant contended, plaintiff failed to allege a justiciable controversy.

Meanwhile, plaintiff's appointment came up for review again in late 2008 or early

---

**6.**  Additionally, the November 17, 2000 letter was accompanied by a cover letter from Dean Fennell with the following language: "Dear Beverly: At last!  A version that passed muster with university counsel!"

**7.**  According to Armstrong, the couple believed that Haviland would be renewed unless evidence " 'demonstrated incompetence, dishonesty in teaching or research, substantial or manifest neglect of duty, personal conduct,' which substantially [impairs] fulfillment of institutional responsibility."

2009. The same standard of "sustained excellence in teaching" was employed for the second review. This time, however, Haviland was reappointed for a six-year term running through June 2015.

A bench trial before a Superior Court justice commenced on December 10, 2009. The plaintiff testified at trial and recounted essentially the same facts as set forth by Armstrong. Haviland testified that she remains uncertain about what standard Brown will employ for her next renewal and that she felt "damaged" by Brown's "betrayal." Haviland also stated that she was not concerned with meeting the reappointment policies or criteria because she previously had "met the standards of two distinguished institutions of higher education, and [she] was confident that [she] could meet whatever standards Brown had for its teachers." [8]

Brown presented Cathy Ann Trower (Trower) as an expert witness on tenure-track professorships and alternative arrangements. Trower testified that, in her fifteen or sixteen years of experience reviewing tenure and alternative track arrangements, she never had seen a similar provision for a non-tenure track position as was embodied in the October 18 letter. Trower stated that descriptions of typical non-tenure positions vary a great deal, whereas the standard outlined in the October 18 letter "reads almost similarly, almost exactly to the tenure criteria by which you could dismiss or nonrenew a tenured faculty member * * *." She also

opined that the language in the October 18 letter could be viewed as tantamount to *de facto* tenure, and that "an experienced academic * * * would question as to whether a dean could grant *de facto* tenure." On cross-examination, however, Trower acknowledged that the two-body problem in academia frequently results in universities crafting unusual solutions in order to accommodate dual-career couples. Trower also agreed that it would be reasonable for a professor seeking employment with a university to rely on representations made by the dean and president, but she then noted that for employment security, a reasonable academic could not rely on the representations in the first of the three letters because the later letters would alter one's understanding of the first.

The trial justice issued a written decision on February 11, 2010. On the issue of justiciability, the trial justice found that plaintiff suffered injury in fact and had standing because the injury did not relate to "current unemployment, but the uncertainty as to the standard to be applied in connection with review by the University regarding future reappointments." The trial justice noted that plaintiff's injury was neither "conjectural" nor "hypothetical." He concluded that the ongoing uncertainty with her protected contractual rights creates plaintiff's actual and present harm. Quoting § 9–30–12, the trial justice noted that the purpose of declaratory actions under the UDJA is "to afford relief

---

8. Significantly, two letters in support of Haviland's reappointment and in favor of reversing the TPAC's decision were introduced into evidence during trial. One letter, dated January 27, 2005, was penned by Dean Fennell to then-President Ruth Simmons, describing her understanding of the terms of Haviland's contract, including that nonrenewal would occur only if Haviland was found in dereliction of her duties and that Haviland would be granted "some semblance of job security even though she would not be considered a tenured member of the faculty." Sheila Blumstein (who no longer was serving as Interim President) wrote the second letter in support of Haviland's reappointment—indicating that, although Haviland could not be offered a tenured position, she was offered a title that reflected her status as an associate professor, a standard of review "following the same standards as tenured faculty," and similar benefits as regular Brown faculty.

from uncertainty and insecurity with respect to rights, status, and other legal relations." In finding that plaintiff's insecurity and uncertainty about the standard to be applied to her employment renewal provided evidence sufficient to establish that there was an actual controversy, the trial justice determined the case justiciable.

Addressing the substantive issues before him, the trial justice found that the parties entered into an implied-in-fact, enforceable contract. He determined that it was reasonable for plaintiff to conclude, based on the communications she received, that Brown would employ the tenure-like standard for renewal, as reflected in the October 18 letter, and that it was not plaintiff's intent to accept the terms of the University's offer unless a standard similar to that contained in the October 18 letter was included. The trial justice declared that there had been a meeting of the minds that Brown offered plaintiff employment and that plaintiff acted reasonably in construing the offer, which she accepted because it was an "exception" to the University's usual contract-renewal standards. As such, the trial justice found and declared that the parties entered into an enforceable contract.

Alternatively, the trial justice concluded that plaintiff satisfied all the requisite elements of promissory estoppel. For the first element, he declared that the October 18 letter contained a "clear and unambiguous statement of the criteria to be applied for non-renewal of [plaintiff's] employment agreement * * * [which was] reaffirmed in the November 17 letter written by Dean Fennell." The trial justice found that plaintiff was justified in relying on the promises made by the University, considering that the communications were made by the Dean, Interim President, and Provost. Finally, the trial justice concluded

that plaintiff suffered detriment by relying on defendant's promise of employment security when she resigned from her tenured position at SUNY–Stony Brook, placed her Long Island home on the real estate market, purchased a home in Rhode Island, and moved her family here. The trial justice declared that plaintiff's "current employment agreement with Brown University is governed by the renewal terms as articulated in the letter dated October 18, 2000." He further declared that "[a]ny review for reappointment of [plaintiff] using any other standard, including the Departmental standard of 'sustained excellence in teaching,' is contrary to the employment agreement between [plaintiff] and Brown University." Final judgment entered on March 2, 2010. The defendant appealed.

On appeal, Brown argues that this case should have been dismissed because plaintiff failed to present a justiciable controversy, as there was no showing of actual or imminent injury. The defendant additionally avers that the trial justice erred in finding in favor of plaintiff on her declaratory judgment counts because the evidence did not establish an enforceable promise of *de facto* tenure, nor did the pre-hire letters manifest the intent to enter into such an agreement. The defendant further averred that only the Brown Corporation had the authority to confer tenure or tenure-like status.

### Standard of Review

"A Superior Court decision granting or denying declaratory relief is reviewed with great deference by this Court." *Providence Lodge No. 3, Fraternal Order of Police v. Providence External Review Authority*, 951 A.2d 497, 502 (R.I. 2008) (citing *Fleet National Bank v. 175 Post Road, LLC*, 851 A.2d 267, 273 (R.I. 2004)). "It is well-established that 'the findings of fact of a trial justice, sitting

without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong.'" *Fleet National Bank,* 851 A.2d at 273 (quoting *Casco Indemnity Co. v. O'Connor,* 755 A.2d 779, 782 (R.I. 2000)). Additionally, the "resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence, are entitled to the same deference." *Narragansett Electric Co. v. Carbone,* 898 A.2d 87, 97 (R.I. 2006) (quoting *Hawkins v. Town of Foster,* 708 A.2d 178, 182 (R.I.1998)). "A trial justice's findings on questions of law, however, are reviewed *de novo.*" *Fleet National Bank,* 851 A.2d at 273.

## Analysis

### I

### Justiciability

The defendant avers that plaintiff did not present a justiciable controversy because she could not demonstrate injury in fact, as she faced no imminent loss of employment. "The requirement of justiciability is one of the most basic limitations on the power of this Court to review and issue rulings." *State v. Beechum,* 933 A.2d 687, 689 (R.I.2007). "The threshold determination when confronted with a claim under the UDJA is whether the Superior Court is presented with an actual case or controversy." *N & M Properties, LLC v. Town of West Warwick ex rel. Moore,* 964 A.2d 1141, 1144 (R.I.2009) (citing *Bowen v. Mollis,* 945 A.2d 314, 317 (R.I.2008)). In the absence of this preliminary determination, the court lacks the requisite authority to entertain the claim. *See id.* at 1144–45. "By definition, a justiciable controversy must contain a plaintiff who has standing to pursue the action; that is to say, a plaintiff who has suffered 'injury in fact.'" *Meyer v. City of Newport,* 844 A.2d 148,

151 (R.I.2004) (quoting *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 28, 317 A.2d 124, 131 (1974)). Injury in fact has been described as "an invasion of a legally protected interest which is (a) concrete and particularized * * * and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Pontbriand v. Sundlun,* 699 A.2d 856, 862 (R.I.1997) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The defendant contends that plaintiff has not established an actual or imminent injury because plaintiff was reappointed in 2004 and again in 2009, and because her employment is not subject to review until 2014—one year before her contract expires. The defendant also asserts that an "actual" injury to plaintiff would be a past or present loss of employment, and an "imminent" injury would be a future, anticipated loss of employment. Because, defendant contends, plaintiff's concern about what might happen when she again is subject to review for reappointment does not amount to actual or imminent injury, plaintiff has no standing. We disagree.

Section 9–30–2 of the UDJA provides:
"Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

Additionally, with regard to contracts, the UDJA does not require a party to allege a breach of the contract in order to obtain relief because "[a] contract may be construed either before or after there has been a breach thereof." Section 9–30–3.

The purpose of the UDJA also is to protect parties, resolve controversies, and "afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations * * *." Section 9–30–12.

The plaintiff is an interested party whose rights derive from her employment agreement with Brown. Regardless of the existence or nonexistence of an enforceable contract between the parties, Haviland began employment with Brown based on the various communications exchanged. Her interest in her continued employment is undisputable and constitutes a legally-protectable interest. As the trial justice noted, "[p]laintiff's claim involves a present harm, not a future harm. The present harm is the uncertainty based upon the [p]laintiff's objectively reasonable belief that the University will continue in its failure to honor the negotiated terms of her employment." The defendant failed on two prior occasions to provide plaintiff with the tenure-like standard that she had understood would govern her reviews. We agree that plaintiff's continued uncertainty as to which standard Brown will employ for her reviews is a concrete and particularized interest. The plaintiff need not wait for a third violation to occur in 2014 and hope that the winds again will blow fair. We are of the opinion that plaintiff has standing to seek declaratory relief to resolve the real uncertainty she has concerning her employment security with Brown.

## II

### The Contractual Relationship

■ The defendant contends that the trial justice erred in determining the existence of an implied-in-fact contract between plaintiff and Brown University because insufficient evidence was presented to establish an enforceable promise of what Brown characterizes as *de facto* tenure for the untenured position of Senior Lecturer.

■ The trial justice determined that an "integrated document does not exist," but he found, based on the evidence before him, that an implied-in-fact contract arose from the dealings of the parties. An implied-in-fact contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and communications between the parties, rather than from a single clearly expressed written document." *Marshall Contractors, Inc. v. Brown University*, 692 A.2d 665, 669 (R.I.1997). Based on the various letters, cover pages, assurances, and discussions between plaintiff and the University Dean, Provost, and Interim President, the trial justice determined that there was a "meeting of the minds on the terms of the offer in that it corresponded to the three criteria of title, benefits, and job security referred to by Armstrong as conditions of Haviland's appointment that were required for him to accept the Deanship." The trial justice also noted that "both sides acted in ways that confused, rather than clarified, the relationship."

■ The determination of whether a contract exists is a question of law, which this Court reviews *de novo*. *Nonnenmacher v. City of Warwick*, 722 A.2d 1199, 1202 (R.I.1999). The trial justice found that an implied-in-fact contract arose in this case. However, we are of the opinion that, although the terms of the agreement are not set forth in a single document, an enforceable, express employment contract was entered into in this case. In determining the existence of an enforceable contract, we employ the principles of contract law. "Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such

assent a contract is not formed." *Smith v. Boyd,* 553 A.2d 131, 133 (R.I.1989). "This Court has established that for parties to form a valid contract, each must have the intent to be bound by the terms of the agreement." *Weaver v. American Power Conversion Corp.,* 863 A.2d 193, 198 (R.I. 2004) (citing *Rhode Island Five v. Medical Associates of Bristol County, Inc.,* 668 A.2d 1250, 1253 (R.I.1996)).

██ "In an expressed contract the terms and conditions of the contract are assented to orally or in writing by the parties." *J. Koury Steel Erectors, Inc. of Massachusetts v. San–Vel Concrete Corp.,* 120 R.I. 360, 365, 387 A.2d 694, 697 (1978). In this case, the terms of the contract are contained within the several communications and letters exchanged between Brown University and Haviland, and accepted by Haviland on November 19, 2000. The defendant, in fact, concedes that the "relevant manifestation of defendant's objective intention" was contained in the series of four letters it sent to Haviland in 2000: October 18, November 6, November 8, and November 17. The University considers the third letter, dated November 8, 2000, to be the "formal offer" extended to Haviland. The November 8, 2000 letter described the positions and titles Haviland would assume, and it set forth her salary and the various policies with which she would be expected to comply. However, not all the contract terms were set forth in that letter—the letter was silent as to a contract renewal standard. When Haviland signed the November 8 offer letter, she did so only after receiving assurance from Dean Fennell that the letter of October 18 had not been superseded by subsequent writings and that it was not "null and void." Although the contractual elements of offer and acceptance were satisfied, giving rise to an express contract between Haviland and Brown University,

the terms assented to were those contained in the November 8, 2000 letter, supplemented by the terms of the October 18 letter—which were still operative according to the November 17 letter. Thus, we conclude, the terms of the employment contract relating to contract renewal and reappointment are ambiguous.

## III

### The Contractual Ambiguity

██ The essence of this controversy arises from a disagreement between the parties about the standard of review to be applied to Haviland's reappointment. "[W]hether a contract is clear and unambiguous is a question of law." *Beacon Mutual Insurance Co. v. Spino Brothers, Inc.,* 11 A.3d 645, 648 (R.I.2011) (citing *Irene Realty Corp. v. Travelers Property Casualty Co. of America,* 973 A.2d 1118, 1122 (R.I.2009)). "This Court reviews a trial justice's conclusions on questions of law *de novo.*" *Id.* at 649 (citing *International Brotherhood of Police Officers v. City of East Providence,* 989 A.2d 106, 108 (R.I.2010)). "In determining whether or not a particular contract is ambiguous, the court should read the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'" *Young v. Warwick Rollermagic Skating Center, Inc.,* 973 A.2d 553, 558 (R.I.2009) (quoting *Mallane v. Holyoke Mutual Insurance Co. in Salem,* 658 A.2d 18, 20 (R.I.1995)). Contract ambiguity arises "only when [a contract] is reasonably and clearly susceptible of more than one interpretation." *Rotelli v. Catanzaro,* 686 A.2d 91, 94 (R.I.1996) (citing *W.P. Associates v. Forcier, Inc.,* 637 A.2d 353, 356 (R.I.1994)); *see also Andrukiewicz v. Andrukiewicz,* 860 A.2d 235, 238 (R.I.2004) (noting that a "contract is ambiguous if it is 'reasonably susceptible of different constructions'"). "Where an ambiguity exists in a provision of a contractu-

al document, the construction of that provision is a question of fact." *Fryzel v. Domestic Credit Corp.*, 120 R.I. 92, 98, 385 A.2d 663, 666 (1978) (citing *Geary v. Hoffman*, 98 R.I. 413, 417, 204 A.2d 302, 305 (1964); *Russolino v. A. F. Rotelli & Sons*, 85 R.I. 160, 163, 128 A.2d 337, 340 (1957)). We are of the opinion that, although an express agreement was entered into, based on our review of the contract in its entirety, an ambiguity exists concerning the terms of the agreement relative to the standard under which Haviland's reappointment is to be evaluated.

Brown contends that the operative document is the November 8, 2000 formal offer letter and that the standard for evaluating Haviland's job performance is sustained excellence in teaching. The November 8, 2000 letter, however, is silent with respect to the standard of review for Haviland's reappointment, and Haviland signed the "formal offer letter" only after receiving assurances in the letter of November 17, 2000 that the October 18 letter—setting forth the terms for renewal—was "relevant," that it was not "null and void," and that the "two letters work together." Notably, although the November 17, 2000 letter provides that neither position for which Haviland was approved "carries with it tenure," the record is clear that Haviland was neither seeking nor expecting a tenured position; she merely sought an assurance about job security as one of the three criteria she and Armstrong deemed necessary to accept employment with Brown.[9] Moreover, the November 17 letter also provided that, with respect to her appointment as a visiting professor, "exceptions in extraordinary circumstances can be made

in accordance with faculty appointment policies" and that Haviland's situation probably would be "consider[ed] as one of those exceptions."

The October 18, 2000 letter included express promises that Haviland's appointment as Visiting Associate Professor and Senior Lecturer at Brown would be "governed by all the rules and regulations pertaining to term faculty appointments * * * and listed in *The Faculty Rules and Regulations * * *.*" However, the letter also assured her that her appointment would be renewed unless Brown presented her with "adequate cause for non-renewal," which was defined in the letter as being "substantially equivalent to adequate cause for dismissal of a tenured faculty member from the University * * * [and was described as] demonstrated incompetence, dishonesty in teaching or research, substantial and manifest neglect of duty, or personal conduct which substantially impairs fulfillment of institutional responsibility." As the trial justice noted, the standard of review set forth within the October 18 letter was atypical for non-tenured faculty, but was nonetheless clear and unambiguous. The trial justice declared that "[a]mbiguities arose only when subsequent letters made reference to different lengths of time as to her appointments and listed the usual University rules and regulations as to the standards by which she would be judged for renewal and reappointment."

This Court has stated that when an ambiguity exists such that a contract term is capable of more than one reasonable interpretation, such "[a]mbiguities in a contract

---

9. Armstrong testified that the only commonality that Haviland's employment agreement with Brown shared with a tenured professorship was that "she would not be dismissed, [or] not renewed, unless she were shown to have, have been guilty of the incompetence, neglect of duty and so forth [as set forth in] the October 18 letter." He also testified that Haviland knew when she left SUNY–Stony Brook that she was neither tenured nor on a tenure-track at Brown.

must be construed against the drafter of the document." *Fryzel,* 120 R.I. at 98, 385 A.2d at 666–67. We are of the opinion that with respect to the standard of review to be applied to Haviland's reappointment at Brown—based on the various communications between the parties, particularly the letter of November 17, 2000—an ambiguity arose such that this contract term may be subject to more than one reasonable interpretation. In light of this ambiguity, the language in the contract must be construed against Brown, and Haviland's contentions must prevail. Her reappointment is governed by the express terms set forth in the letter of October 18, 2000—"demonstrated incompetence, dishonesty in teaching or research, substantial and manifest neglect of duty, or personal conduct which substantially impairs fulfillment of institutional responsibility."

Because we are satisfied that an express, enforceable contract arose between the parties, we need not reach plaintiff's contention that she is entitled to relief based on a theory of promissory estoppel.

## IV

### The Authority to Contract

■■■ Finally, Brown contends that the members of the administration who courted Armstrong and Haviland lacked the authority—actual or apparent—to provide Haviland with what Brown characterizes as tenure-like status because only the Brown Corporation is vested with such authority. The defendant argues that the University's tenure-awarding procedures require a rigorous, multilayered peer review process—a process that did not occur when hiring Haviland. We disagree that Haviland was clothed with tenure—like status in this case. Haviland received neither tenure nor *de facto* tenure; Brown simply agreed to the aforementioned man-

ner of performance review and, significantly, removal only for cause.

■■■ "An agent's apparent authority to contract on behalf of his [or her] principal arises from the principal's manifestation of such authority to the party with whom the agent contracts." *Menard & Co. Masonry Building Contractors v. Marshall Building Systems, Inc.,* 539 A.2d 523, 526 (R.I. 1988) (citing 1 Restatement (Second) *Agency* § 8 (1958)). "Such manifestation by the principal to the third person need not be in the form of a direct communication to the third person. The information received by the third person may come from other indicia of authority given by the principal to the agent * * *." *Id.* (citing 1 Restatement (Second) *Agency* § 27 cmt. a). And the "third person with whom the agent contracts must believe that the agent has the authority to bind its principal to the contract." *Id.* (citing 1 Restatement (Second) *Agency* § 8 cmt. a).

The recruitment and negotiations in this case involved members of the upper echelon of Brown's administration—including the Dean, the Provost, and the Interim President. Brown is precluded from denying that its administrators had the authority to provide plaintiff with employment security because the University has failed to produce any probative evidence establishing that those officers lacked such authority. Defense witness Trower testified that it was reasonable for Haviland to rely on representations made by the various members of the administration—particularly in light of Interim President Blumstein's suggestion that they "think outside the box" in crafting a position for Haviland in order to achieve what they really wanted—her husband as the Dean of the Faculty. Furthermore, the Brown Corporation did, in fact, approve Haviland's appointment, and therefore ratified that which its agents accomplished. The November 6

letter also included a cover letter with language stating that "your appointment as S[e]nior Lecturer was approved by ConFRaT" [10] and also stating that the administration had been instructed by University counsel to send a follow-up letter regarding renewal of her Senior Lecturer position, but that other than a few minor legal concerns, "[t]here are no real differences." Dean Fennell's November 6 cover letter also contained the following: "Please call me if you see anything unexpected; I can assure you that everything is still as we had agreed earlier. And, congratulations on your positive ConFRaT review."

Further demonstrating Dean Fennell's authority is the language in the November 8, 2000 letter, which Brown contends served as Haviland's formal offer. The first sentence informs Haviland that "on the recommendation of Professors Edward Ahearn, Chair of the Department of Comparative Literature, and Mari Jo Buhle, Chair of the Department of American Civilization, you *shall* be appointed as Senior Lecturer and Visiting Associate Professor in Comparative Literature and American Civilization * * *." (Emphasis added.) This language suggests that plaintiff already had been approved and would definitively be appointed to both positions, pending her acceptance by signature. The language employed by Dean Fennell's cover letter accompanying the November 17 letter also notes that Dean Fennell was

presenting Haviland with "[a] version that passed muster with university counsel[.]"

We note that Rajiv Vohra, the Dean of the Faculty at Brown at the time of the trial (Dean Vohra), testified that Dean Fennell possessed no authority to offer employment terms that are substantially equivalent to tenure. Dean Vohra's testimony was the only suggestion that the various administrators that presented Haviland with her employment offer did not possess the authority to do so. He also testified that on occasion, the University will go "out of our way to structure the terms of appointment that would be attractive [to professors] depending * * * on our interest in the candidate but not to change the rules." If Brown intended to alter the terms that had been set forth in the October 18 letter, it was the University's duty to repudiate such an unusual standard of review and make clear to Haviland that the job security she was relying on no longer was being offered. Brown failed to do so. Instead, the University continued to muddy the waters by continuously referring back to the October 18 letter and by alluding to "varying and sometimes contradictory terms in a variety of communications." [11]

We are satisfied that, based on the various representations conveyed to Haviland from the University administration—including the Dean, Provost, and Interim President—adequate and reliable indicia of authority are manifest on this record to

---

10. According to the Faculty Rules and Regulations, the Committee on Faculty Reappointments and Tenure (ConFRaT) reviews:
    "recommendations, whether positive or negative, concerning the renewal of appointments of Instructors, Assistant Professors and Senior Lecturer, the promotion to the ranks of Senior Lecturer, Associate and full Professor, and the awarding of tenure to untenured faculty members. The Committee will review recommendations of appointments to tenured positions or to the

rank of Senior Lecturer. The Committee will advise the Provost on such recommendations and the Provost will submit his or her recommendations to the President and the Corporation for final action."

11. We echo the trial justice's remark that the University should have created a single, unified document containing an integration clause in order to codify all the contract terms and avoid confusion.

show that the administrators were acting on behalf of the Corporation. Further, we observe that no convincing proof to the contrary was introduced at trial.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.